SAN LAZARO ASSOCIATION, INC., dba Biomedical Laboratory, Plaintiff–Appellee,

v.

Kathleen CONNELL, Controller of the State of California, Defendant–Appellant.

Oganes Nagapetyan; Khachik Simonyan, Plaintiffs–Appellees,

v.

Kathleen Connell, Controller of the State of California; Joseph Munso, Chief Deputy Director of the California Department of Health Services, Defendants–Appellants.

Clinical Care Laboratory, Inc., Plaintiff–Appellee,

v.

Kathleen Connell, Controller of the State of California; S. Kimberly Belshe, Director of the Department of Health Services, Defendants–Appellants.

Nos. 00–55065, 00–55610, 00–55377, 00–55963.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 2001.

Filed Jan. 24, 2002.

Amended April 17, 2002.

Sandra L. Goldsmith, Deputy Attorney General of the State of California, Los Angeles, CA, for the defendants-appellants.

Patric Hooper, Hooper, Lundy & Bookman, Inc., Los Angeles, CA, for the plaintiffs-appellees.

Robert D. Kamenshine, United States Department of Justice, Civil Division, Washington, DC, for amicus United States Department of Health and Human Services, in support of defendants-appellants.

Before NOONAN, SILVERMAN, and PAEZ, Circuit Judges.

## ORDER

The panel has unanimously voted to deny the petition for rehearing. The full court has been advised of the petition for rehearing en banc, and no active judge of the court has requested a vote on the petition for rehearing en banc. Fed. R.App. P. 35(b). The petition for rehearing is denied and the petition for rehearing en banc is denied.

The opinion filed January 24, 2002, is hereby AMENDED as follows:

1. On page 1081 of the slip opinion, the text beginning "The plaintiffs relied on statutory provisions" and ending "federal guidelines. *Id.*" is deleted. The following new paragraph is inserted: "The Court noted that the plaintiffs in *Blessing* had not "identif[ied] with particularity the rights they claimed," and went on to note that some of the provisions of Title IV–D were systemic or structural. *Id.* at 342–44, 117 S.Ct. 1353." For example, Title IV–D provides that States, if they are to receive federal funds, must include, *inter alia*, a "comprehensive system to establish paternity, locate absent parents, and help families obtain support orders." *Id.* at 333–34, 117 S.Ct. 1353. The statute at issue in *Blessing* also provides specific guidelines for the "structure" of the state agency designated to administer this system, such as a requirement for sufficient staffing levels. *Id.* at 333–35, 117 S.Ct. 1353. Additionally, Title IV–D contains the more general requirement that state AFDC plans must be in "substantial compliance" with these and other federal guidelines. *Id.*"

2. On page 1082, delete the phrase "but, with respect to the particular "systemwide" requirements that the plaintiffs invoked" and insert "but, with respect to the "systemwide" requirements in Title IV–D". After "*Id.* at 344, 117 S.Ct. 1353" and before "The structural requirements" the following footnote 9 is inserted: "While spelling out that the systemic and structural provisions of Title IV–D do not give rise to rights enforceable under § 1983, *Blessing* did "not foreclose the possibility that some provisions of Title IV–D give rise to individual rights," and remanded for the District Court to construe the complaint to determine whether "any specific claim asserts an individual federal right." *Id.* at 345–346, 117 S.Ct. 1353."

## OPINION

PAEZ, Circuit Judge.

This case arises from a joint effort by the State of California and the Federal Bureau of Investigation ("FBI") to investigate fraud in the State's Medicaid/Medi–Cal Program. Plaintiffs are providers of medical services to Medi–Cal recipients. The California Department of Health Services ("DHS") instructed the Controller of the State of California ("Controller") to withhold payments to Plaintiffs after receiving an audit report from the Controller and other information from the FBI that Plaintiffs may have submitted fraudulent payment requests. Plaintiffs, in three separate actions under 42 U.S.C. § 1983, sought to enjoin DHS from utilizing the Controller's audit and the FBI information to withhold payments. The district court, ruling on cross-motions for summary judgment, granted Plaintiffs the relief they requested. It enjoined DHS from utilizing the Controller's audits to withhold payments to Plaintiffs. The district court concluded that: (1) by authoriz-

ing the Controller to conduct Medi–Cal provider audits, DHS improperly delegated its discretionary authority to the Controller in violation of a requirement under the Medicaid Act[1] that a single state agency administer or supervise the State's Medicaid program; (2) Plaintiffs, as Medi–Cal providers, had a right under 42 U.S.C. § 1983 to enforce the single state agency requirement; and (3) the Controller's audit could not constitute "reliable evidence" sufficient to justify withholding payments under 42 C.F.R. § 455.23. The district court also awarded Plaintiffs attorney's fees under 42 U.S.C. § 1988.

Because there have been significant developments regarding the status of several of the Plaintiffs as Medi–Cal providers during the course of the district court proceedings as well as after entry of the district court's judgments, we initially address whether any of Plaintiffs' claims are moot. We conclude that, because Plaintiff San Lazaro Association, Inc. ("San Lazaro") canceled its laboratory license, its claims are moot. Accordingly, we dismiss the appeal in case no. 00–55065. Nonetheless, we have jurisdiction over Defendants' appeal in case no. 00–55610 from the district court's order granting San Lazaro attorney's fees. Aside from San Lazaro's claims, the other Plaintiffs' claims present live controversies over which we have jurisdiction. We also have jurisdiction over Defendants' appeals from the district court's orders granting attorney's fees to these Plaintiffs.

On the merits, because we hold that the single state agency requirement does not establish a right that the remaining Plaintiffs can enforce under 42 U.S.C. § 1983, we reverse the district court's summary judgments. We also reverse the attorney's fee awards under 42 U.S.C. § 1988.

1. See Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–96v, and 42 C.F.R.

Finally, we hold that Plaintiffs Nagapetyan and Simonyan cannot assert a viable claim for relief under 42 C.F.R. § 455.23.

### I.

#### Background

We briefly review the structure of the Medicaid Act and its implementation in California. We also summarize the events that precipitated the instant actions, and the district court's resolution of Plaintiffs' claims.

#### A. Medicaid and Medi–Cal

■ Under the Medicaid Act, the federal government underwrites part of the costs of state programs providing medical care to eligible needy individuals. In order to receive federal support, the States must comply with requirements of the Medicaid Act and with regulations promulgated by the Department of Health and Human Services ("HHS"). *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

#### 1. Single state agency requirement

Among the requirements that the Medicaid Act established for state programs, 42 U.S.C. § 1396a(a)(5) mandates that a participating State "provide for the establishment or designation of a single State agency to administer or to supervise the administration of the [State's] plan." HHS' regulations interpret this requirement as follows:

> [ ] Authority of the single State agency. In order for an agency to qualify as the Medicaid agency—
>
> (1) The agency must not delegate, to other than its own officials, authority to—

§ 431.10(e).

(i) Exercise administrative discretion in the administration or supervision of the plan, or

(ii) Issue policies, rules, and regulations on program matters.

(2) The authority of the agency must not be impaired if any of its rules, regulations, or decisions are subject to review, clearance, or similar action by other offices or agencies of the State.

(3) If other State or local agencies or offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency.

42 C.F.R. § 431.10(e).

## 2. *Payment and verification of provider claims*

█ Under the Medicaid Act, "[t]he state plan is required to establish ... a scheme for reimbursing health care providers for the medical services provided to needy individuals." *Wilder*, 496 U.S. at 502, 110 S.Ct. 2510. Various statutory provisions and regulations require the States to verify the legitimacy of payment claims. *See, e.g.*, 42 U.S.C. § 1396a(a)(42) (explaining that a state plan must "provide that the records of any entity participating in the plan and providing services reimbursable on a cost-related basis will be audited as ... necessary to insure that proper payments are made under the plan"); 42 C.F.R. § 447.202 ("The Medicaid agency must assure appropriate audit of records if payment is based on costs of services or on a fee plus costs of materials.").

A provider may face various consequences for submitting an improper claim. A state's Medicaid agency can withhold payments to providers "upon receipt of reliable evidence" that a provider has engaged in "fraud" or "willful misrepresentation." 42 C.F.R. § 455.23(a). Overpayments can be recovered through administrative proceedings. *See e.g.*, Cal. Code Regs. tit. 22, § 51047. Providers can be decertified and barred from participation in the Medicaid program. 42 U.S.C. § 1320a–7b(a)(1) & (6). Medicaid fraud also may result in criminal prosecution. 42 U.S.C. § 1320a–7b(a) (setting forth criminal penalties for false statements or representations in provider claims for payments); 18 U.S.C. § 1347 (specifying criminal penalties for scheme to defraud health care benefit program); *see also United States v. Woodley*, 9 F.3d 774, 778 (9th Cir.1993) (upholding mail fraud conviction against Medicare provider).

## 3. *California's Medicaid program*

Pursuant to 42 U.S.C. § 1396a(a)(5), California has designated DHS as its Medicaid agency, with responsibility for "administer[ing] or ... supervis[ing] the administration" of Medi–Cal, California's Medicaid program.

DHS retains a private contractor, Electronic Data Services ("EDS"), to process reimbursement claims by Medi–Cal providers. EDS utilizes an electronic claims processing system to review Medi–Cal claims and determine the amount owed. EDS then forwards its calculations to the Controller for payment. However, EDS does not conduct audits of provider claims.

DHS audits some provider claims, and supplements its own efforts by relying on audits performed by the Controller. DHS has defined the scope of the Controller's audit responsibilities through a series of inter-agency agreements with the Controller. A number of other agencies also may become involved in Medi–Cal fraud investi-

gations. At relevant times, for example, the FBI has worked with both DHS and the Controller to investigate Medi–Cal fraud.

### B. *Investigations and proceedings involving Plaintiffs*

When the four Plaintiffs filed these actions, they were Medi–Cal providers. Khachik Simonyan was the owner of Eagle Medical Supply ("Eagle"), and Oganes Nagapetyan owned Nairi Pharmacy ("Nairi"). Both Eagle and Nairi provided medical supplies and equipment to Medi–Cal recipients. San Lazaro provided laboratory tests for Medi–Cal recipients. Clinical Care Laboratory, Inc. ("Clinical Care") provided clinical laboratory services to Medi–Cal recipients.

In 1998, the Controller audited all four Plaintiffs. In addition, the FBI, in coordination with the Controller, initiated an investigation of Eagle and Nairi. The investigations disclosed evidence of possible fraud. The Controller and the FBI reported their findings to DHS and either requested or recommended that DHS temporarily withhold payments to all Plaintiffs.[2] DHS ultimately withheld payments to all four Plaintiffs.

### C. *Legal proceedings*

#### 1. *Nature of the claims*

Plaintiffs filed three separate lawsuits in federal district court. San Lazaro and Clinical Care filed separate actions in 1998. Simonyan and Nagapetyan jointly filed an action in 1999. In each case, Plaintiffs alleged that Medicaid's single state agency requirement prohibited DHS from delegating responsibility to the Controller for conducting provider audits and from relying on the results of the Controller's audits to withhold payments. Plaintiffs also alleged that, under the Medicaid Act, the Controller's audit findings could not be considered reliable evidence of fraud or willful misrepresentation. And they contended that DHS' improper delegation of responsibility was actionable under 42 U.S.C. § 1983. Plaintiffs sought declaratory relief that the Controller's audit activities were contrary to law, an injunction against further audits by the Controller, and an injunction against continued withholding of payments. All three related actions were assigned to the same district court judge.

#### 2. *Preliminary injunctive relief and summary judgment on the merits*

The district court granted preliminary injunctive relief in all three cases. Then, in three successive rulings, the district court granted summary judgment in favor of each Plaintiff.

The district court held that the alleged violations of Medicaid's single state agency requirement were actionable under § 1983. In concluding that Defendants had violated the single state agency requirement, the district court relied primarily on 42 C.F.R. § 431.10(e)(1)(i), which prohibits a State's designated Medicaid agency from delegating authority to "[e]xercise administrative discretion in the administration or supervision of the plan." The district court interpreted that provision to mean that no state agency other than California's Medicaid agency (DHS) could undertake any programmatic Medi–Cal task that requires any form of review or discretion. Concluding that the Controller's audits required review and discretionary analysis, the district court held that the audits violated 42 C.F.R. § 431.10 and could not be

---

**2.** Because providers are paid from the Treasury of the State of California and the Controller is responsible for making authorized payments from the Treasury, DHS, as the single state agency, must instruct the Controller to withhold payment. Accordingly, we refer to DHS as withholding the payments.

the basis for withholding payments to providers.[3]

The district court also ruled that DHS violated 42 C.F.R. § 455.23[4] when it failed to obtain "reliable evidence" of fraud before withholding payments. The district court ultimately excluded from DHS's consideration any evidence from the Controller's audits, reasoning that the single state agency requirement prohibited the Controller from gathering evidence of fraud.

The district court granted Plaintiffs' motions for summary judgment and permanently enjoined the Controller and her agents from auditing, reviewing, or investigating Medi–Cal reimbursement claims by Plaintiffs. The district court also enjoined DHS from withholding Medi–Cal payments on the basis, either directly or indirectly, of the Controller's audits. Finding that each of the Plaintiffs were prevailing parties under 42 U.S.C. § 1988, the district court awarded each of them attorney's fees.

Defendants filed timely notices of appeal from the district court's orders and from its entry of judgment in each case.

## II.

### Mootness

Before addressing the merits, we must determine whether the issues presented to us on appeal have been rendered moot by intervening developments. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (holding that mootness is jurisdictional); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (plurality opinion) (holding that jurisdictional questions must be addressed before merits); *id.* at 110–11, 118 S.Ct. 1003 (O'Connor, J., concurring) (observing that "federal courts should be certain of their jurisdiction before reaching the merits of a case").

 A case loses its quality as a "present, live controversy" and becomes moot when there can be no effective relief. *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir.2001). Here, because of the doctrine of sovereign immunity, Plaintiffs can seek only prospective, injunctive relief.[5] Thus, for Plaintiffs to have a live

---

3. The district court suggested that DHS' reliance on investigative findings by the FBI also would involve an impermissible delegation of authority.

4. Section 455.23 provides in relevant part: "The State Medicaid agency may withhold Medicaid payments ... to a provider upon receipt of reliable evidence ... [of] fraud or willful misrepresentation under the Medicaid program."

5. Under *Ex Parte Young*, the district court could grant prospective injunctive relief against state officials, such as the Controller, to enjoin them from unlawful conduct. 209 U.S. 123, 155–156, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The district court could not, however, award "retroactive payment of benefits found to have been wrongfully withheld" by state officials. *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *id.* at 668–69, 94 S.Ct. 1347 (holding that sovereign immunity bars relief that

would "require[ ] payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those" who were harmed by a past legal wrong "at a time when[the State] was under no court-imposed obligation to conform to a different standard.").

These constraints would not apply if California consented to suit for retroactive damages. *Id.* at 673, 94 S.Ct. 1347. But "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, [courts] will find [a] waiver only where stated by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction." *Id.* (internal quotation marks and citation omitted). The States, including California, have not consented to suit by accepting Medicaid funds. *See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1226 n. 13

"case or controversy" with the State, they must be in a position to benefit from prospective, injunctive relief.

We conclude that San Lazaro's claim on the merits is moot. However, the other Plaintiffs' challenges to the Controller's audits and to DHS' reliance on those audits present live controversies over which we have jurisdiction. We also have jurisdiction to review the district court's awards of attorney's fees to Plaintiffs.

### A. San Lazaro

■ Shortly after the district court entered summary judgment, San Lazaro voluntarily canceled its laboratory license. By canceling its license, San Lazaro became ineligible to participate in the Medi-Cal program. See Cal. Bus. & Prof.Code § 1265(a); Cal.Code Regs. tit. 22, §§ 51200, 51211.2. Defendants then moved under Rule 60(b) of the Federal Rules of Civil Procedure to alter or amend the district court's order granting summary judgment, arguing that San Lazaro's claim had become moot. Because San Lazaro no longer could benefit from the injunctive relief the district court had granted, the district court agreed with Defendants, vacating its summary judgment and dismissing the case as moot.[6] The district court nonetheless awarded San Lazaro attorney's fees on the ground that San Lazaro was the prevailing party under 42 U.S.C. § 1988 because it had obtained injunctive relief that for a time altered the legal relationship between San Lazaro and Defendants.

■ We agree with the district court that San Lazaro's claims became moot when it canceled its laboratory license. See City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 283, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001) (holding that challenge to adult business licensing determination was moot where plaintiff "has ceased to operate as an adult business and no longer seeks to renew its license").[7] Although San Lazaro's substantive claims are moot, its entitlement to attorney's fees is not. See Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1329 (9th Cir. 1999) (holding that "[n]o Article III case or controversy is needed with regard to attorneys' fees as such, because they are but an ancillary matter" over which courts retain jurisdiction "even when the underlying case is moot").

### B. Simonyan and Nagapetyan

■ There are no facts in the record that suggest that the dispute between Simonyan and Defendants is moot. With respect to Nagapetyan, after entry of the district court's judgment, he was convicted of Medi-Cal fraud, and as a result was disqualified from participating in the Medi-Cal program for at least five years. Defendants therefore argue that his case is moot. The district court concluded that Nagapetyan's claim was not moot, because he still might seek to participate in the Medi-Cal program at the expiration of the five-year period.

On the record before us, we have no basis for concluding that Nagapetyan will

---

(11th Cir.2000); see also Wilder, 496 U.S. at 516–518, 110 S.Ct. 2510 (noting that provision in Medicaid statute requiring, as a condition of participation, waiver by the States of sovereign immunity was repealed in 1976, after which only "prospective, injunctive relief" was available).

6. The Controller's appeal of the grant of summary judgment, filed before the district court

vacated the summary judgment, is still pending as case no. 00–55065. We dismiss that appeal because the claims are now moot.

7. There are exceptions to the mootness doctrine, Cole v. Oroville Union High Sch. Dist., 228 F.3d 1092, 1098 (9th Cir.2000) (en banc), cert. denied, 532 U.S. 905, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001), but no party has argued that an exception applies in this case.

not seek to participate in the Medi–Cal program at the end of the five-year period or that he would be barred from participation at that time. We therefore agree with the district court that Nagapetyan's claim is not moot. *See United States v. Concentrated Phosphate Exp. Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (holding that case may become moot "if subsequent events ma[ke] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur") (emphasis added). Also, independent of our conclusion that neither Simonyan's nor Nagapetyan's claims are moot, we have jurisdiction to hear Defendants' appeal from the district court's order granting attorney's fees to Simonyan and Nagapetyan.

### C. Clinical Care Laboratory

■ After Clinical Care filed its complaint, it ceased its business operations and DHS canceled the licenses and certifications that Clinical Care needed to participate in the Medi–Cal program. Also, the Controller completed a final audit report concluding that Clinical Care had claimed payment for services it had not performed. In response to the final audit, Clinical Care requested an administrative hearing with DHS to challenge the audit and DHS's decision to withhold payments. The district court held that the case was not moot because Clinical Care could still seek to enjoin DHS from using the Controller's audits in those proceedings.

We agree with the district court that, because of the potential availability of such relief, Clinical Care's claims are not moot. And, independent of that conclusion, we have jurisdiction over the district court's order granting attorney's fees to Clinical Care.

8. In addition, "[e]ven if a plaintiff demonstrates that a federal statute creates an indi-

### III.

#### Merits

■ In a preliminary ruling that was essential to its ultimate judgment granting injunctive relief to Plaintiffs, the district court accepted Plaintiffs' argument that they have an enforceable right under § 1983 to have the Medi–Cal program administered in accordance with Medicaid's single state agency requirement. We disagree with the district court's determination, and therefore hold that Plaintiffs were not entitled to summary judgment.

■ "In order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (emphasis in original). In *Blessing,* the Supreme Court summarized the approach charted by previous cases:

We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. [*Wright v. Roanoke Redev. & Hous. Auth.,* 479 U.S. 418, 430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)]. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. [*Id.* at 431–32, 107 S.Ct. 766]. Third, the statute must unambiguously impose a binding obligation on the States ... [*Wilder,* 496 U.S. at 510–511, 110 S.Ct. 2510; *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).]

520 U.S. at 340–41, 117 S.Ct. 1353.[8]

vidual right, there is only a rebuttable presumption that the right is enforceable under

Unless Plaintiffs establish that they are the intended beneficiaries of 42 U.S.C. § 1396a(a)(5) and of the regulations interpreting that provision, they do not have an enforceable right, and cannot maintain an action, under § 1983. *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510 (The "inquiry turns on whether the provision in question was intended to benefit the putative plaintiff. If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.") (internal quotation marks, citations and brackets omitted); *see also Wesley Health Care Ctr., Inc. v. DeBuono*, 244 F.3d 280, 283 (2d Cir.2001) ("A plaintiff must show that the violation of the federal law also amounts to the violation of a federal right *possessed by the plaintiff.*") (emphasis added). In analyzing Plaintiffs' contention that they are the intended beneficiaries of the single state agency requirement, we find *Blessing*'s application of the "intended beneficiary" prong highly instructive.

In *Blessing*, the plaintiffs were mothers whose children were eligible for child support services under Arizona's Aid to Families with Dependent Children ("AFDC") program. The plaintiffs claimed that Arizona had not taken adequate steps to obtain child support payments from their childrens' fathers. *Blessing*, 520 U.S. at 337, 117 S.Ct. 1353. They argued that Arizona's allegedly deficient performance violated various provisions of Title IV–D of the Social Security Act and that such violations were actionable under § 1983. *Id.*

The Court noted that the plaintiffs in *Blessing* had not "identif[ied] with particularity the rights they claimed," and went on to note that some of the provisions of Title IV–D were systemic or structural. *Id.* at 342–44, 117 S.Ct. 1353. For example, Title IV–D provides that States, if they are to receive federal funds, must include, *inter alia*, a "comprehensive system to establish paternity, locate absent parents, and help families obtain support orders." *Id.* at 333–34, 117 S.Ct. 1353. The statute at issue in *Blessing* also provides specific guidelines for the "structure" of the state agency designated to administer this system, such as a requirement for sufficient staffing levels. *Id.* at 333–35, 117 S.Ct. 1353. Additionally, Title IV–D contains the more general requirement that state AFDC plans must be in "substantial compliance" with these and other federal guidelines. *Id.*

The Court concluded that the requirements on which the plaintiffs relied were "not intended to benefit individual children and custodial parents" and therefore did not create "individual entitlement[s]." *Id.* at 343, 117 S.Ct. 1353. The Court viewed provisions requiring "substantial compliance" and "sufficient staffing" as "designed only to guide the State in structuring its systemwide efforts at enforcing support obligations." *Id.* at 344–45, 117 S.Ct. 1353. Obviously, state AFDC programs are intended to benefit dependent children and their supporting parents, but, with respect to the "systemwide" requirements in Title IV–D the Court noted that "[t]hese provisions may ultimately benefit individuals who are eligible for [AFDC] services, but only indirectly." *Id.* at 344, 117 S.Ct.

§ 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress specifically foreclosed a remedy under § 1983." *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353 (internal quotation and citation omitted). Because we conclude that Plaintiffs

have not demonstrated that Medicaid providers have a right to have Medicaid programs administered in accordance with the single state agency requirement, we need not address this additional hurdle for § 1983 plaintiffs.

1353.[9] The structural requirements were "simply intended to improve the overall efficiency of the States' child support enforcement scheme." *Id.* at 345, 117 S.Ct. 1353.

Our analysis of Medicaid's single state agency requirement leads us to a similar conclusion. The text of 42 U.S.C. § 1396a(a)(5) and 42 C.F.R. § 431.10(e), along with the legislative and regulatory history, persuade us that the single state agency requirement is a structural programmatic requirement that facilitates federal oversight of state Medicaid programs.[10] *Blessing,* 520 U.S. at 344, 117 S.Ct. 1353. It does not create "individual entitlement[s]." *Id.* at 343, 117 S.Ct. 1353.

### A. Single state agency requirement

#### 1. Statutory and regulatory scheme

Neither the statute nor the regulations are phrased in terms that define a legal right possessed by providers, and neither "focus[es]" on providers. *Cf. Wilder,* 496 U.S. at 510, 527, 110 S.Ct. 2510 ("There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms of benefiting ... providers"); *Wright,* 479 U.S. at 430, 107 S.Ct. 766 (holding that where limitations on public housing rent levels "focus[ ] on the individual family and its

income ... [t]he intent to benefit tenants is undeniable"). To the contrary, the single state agency requirement mandates an administrative structure for state Medicaid programs. This administrative scheme imposes a "systemwide" requirement that administration and overall supervision of state Medicaid programs be centralized. The single state agency requirement allows Congress to specify how state Medicaid agencies must carry out their Medicaid functions, from providing benefits to Medicaid recipients to keeping statistics and reporting those statistics and other information to the federal government.

In short, although the single state agency requirement may "ultimately benefit" many of those who have dealings with state Medicaid programs, it cannot be said to do so in any targeted manner. *Blessing,* 520 U.S. at 344, 117 S.Ct. 1353. To the extent there is a benefit to such individuals, it is an indirect one. *Id.*

#### 2. Legislative history

The legislative history of the single state agency requirement supports this conclusion. The requirement in the Medicaid Act is patterned after the single state agency requirement imposed on the States by the Social Security Act of 1935. *See* 42 U.S.C. §§ 302, 1202. Congress' purpose in including the requirement in the Social

---

9. While spelling out that the systemic and structural provisions of Title IV–D do not give rise to rights enforceable under § 1983, *Blessing* did "not foreclose the possibility that some provisions of Title IV–D give rise to individual rights," and remanded for the District Court to construe the complaint to determine whether "any specific claim asserts an individual federal right." *Id.* at 345–346, 117 S.Ct. 1353.

10. We note that the California Court of Appeal has reached the same conclusion in an unrelated case involving the review of an administrative determination by DHS based on

the Controller's finding of an overpayment to a Medi–Cal provider. *RCJ Med. Servs., Inc. v. Bonta,* 91 Cal.App.4th 986, 111 Cal.Rptr.2d 223, 231–32, 238 (2001). The state court of appeal deferred to HHS' opinion that DHS's delegation of audit authority to the Controller was consistent with the single state agency requirement. *Id.* at 235. The court stated that the purpose of that requirement was "to avoid a diversity of operating standards within a state and to ensure that one agency would be accountable to the federal government for the operation of [the] Medicaid program and compliance with federal law." *Id.* at 238.

Security Act of 1935 is not entirely clear, but it suffices to note that nothing in the legislative history of the Social Security Act suggests that the single state agency requirement was included for the benefit of providers of services.[11]

Congress included a parallel single state agency requirement in the Medicaid Act in 1965 without significant discussion. The only debate was whether the Medicaid Act should require a particular type of state agency to serve as the single state agency or instead whether States should be permitted to designate an agency of their choice. *See Sobky v. Smoley*, 855 F.Supp. 1123, 1145-46 (E.D.Cal.1994) (reviewing legislative history). Nothing in the legislative history of the Medicaid Act ties the single state agency requirement to the interests of providers.

### 3. *History of agency interpretation*

The history of 42 C.F.R. § 431.10, the regulation interpreting the Medicaid Act's single state agency requirement, is more illuminating in identifying the purpose of the requirement, but is of no help to Plaintiffs. That history suggests that the single state agency requirement was intended primarily to ensure systemwide accountability of state Medicaid programs to the federal government. And, more to the point, that history provides no evidence that the requirement was intended to benefit Medicaid providers.

Prior to the 1965 enactment of the Medicaid Act, the United States Bureau of Family Services—the agency responsible for social security programs at the time—issued a *Handbook of Public Assistance Administration.* Bureau of Family Servs., U.S. Dep't of Health, Educ., and Welfare, *Handbook of Public Assistance Administration* (1963/1964) (the *"Handbook"*). The *Handbook* was the "official medium for issuance of interpretations and instructions concerning requirements of the public assistance titles of the Social Security Act and recommendations for the administration of State public assistance programs." *Id.* at i.

The *Handbook* prohibited—as 42 C.F.R. § 431.10(e) does now—delegation by the single state agency of authority for "exercising administrative discretion in the administration or supervision of the plan" and also provided that other state agencies performing services for the single state agency could not "substitute their judgment" for that of the single state agency. *Compare Handbook* §§ 2200(3), (5) *with* 42 C.F.R. §§ 431.10(e)(1)(i), (e)(3). The *Handbook* states that the single state agency's *purpose* was to provide a single state actor that would be accountable to the federal government for systemwide performance:

> Once the single State agency is established or designated, it is the agency of the State government that represents the State *in its dealings with the Federal agency* on all aspects of the plan and its operation. It is the agency of the State government responsible for the

---

**11.** Prior to enactment of the Social Security Act of 1935, most social welfare benefits were provided at the county level. One of the arguments for enacting federal social security legislation was that Congress should eliminate disparities in benefit levels and eligibility criteria among local jurisdictions. Robert B. Stevens, *Statutory History of the United States: Income Security* 20–31, 70–81 (1970) (quoting from *Social Security in America*, a report of the Commission on Economic Security). And

at least one explanation for Congress's inclusion of the single state agency requirement in the Social Security Act is that the requirement was intended to "avoid a diversity of operating standards in the subdivisions within the State[s]." *Guidice v. Jackson,* 726 F.Supp. 632, 635 (E.D.Va.1989) (quoting Social Security Board, *Social Security in America, A Summary of the Staff Reports of the Committee on Economic Security* 161, 191 (1937)), *aff'd,* 915 F.2d 1564 (4th Cir.1990).

development and maintenance of a plan in conformity with all requirements of the Social Security Act and for the administration of the plan throughout the State. This State agency is *accountable* for the expenditure of Federal funds in accordance with the requirements of the Social Security Act, whether such funds are expended by the localities or by the State. It is *accountable* for insuring that funds will be available in all political subdivisions for assistance payments and for operation of the program on a uniform basis. The single State agency is charged with final administrative responsibility.

*Handbook* § 2300 (emphasis added). According to the *Handbook,* the single state agency has "continuing responsibility for the quantity, quality, utilization, and payment for services provided to recipients," but this responsibility, as expressed by the *Handbook,* clearly is imposed to promote systemwide efficiency rather than to benefit providers. *Id.* § 2310.

After the Medicaid Act was enacted in 1965, Supplement D, addressing medical assistance programs, was added to the *Handbook.* Supplement D reiterated the *Handbook* 's view that the single state agency requirement ensures systemwide performance and, in particular, ensures accountability to the federal government:

> Once the single State agency is established or designated it is the agency of the State government that represents the State in its dealings with the [federal agency in charge of Medicaid] on all aspects of the medical assistance plan and its operation. It is the agency of the State government responsible for: obtaining the statutory authority necessary to submit a plan meeting all Federal requirements; preparing the State plan and establishing policies for the operation of the program; assuring that it can carry out the plan in all political subdivisions; obtaining the State funds or the State-local funds (as the case may be); meeting all audit requirements; and being accountable to the [federal agency in charge of Medicaid] for the proper and efficient administration of the program.

*Id.* § D–2140 (1966).

Subsequently, the nondelegation principles set forth in the *Handbook* were codified in 42 C.F.R. § 431.10(e). Public Assistance Programs, 35 Fed.Reg. 8780 (June 5, 1970) (stating that "the proposed regulations set forth certain requirements and provisions for the public assistance programs under the Social Security Act now contained in the Handbook of Public Assistance Administration" and the "purpose is to incorporate existing requirements in the Code of Federal Regulations"). In the rulemaking that resulted in the new regulations, there is no discussion of the purposes served by the single state agency requirement. From this silence, we can infer that 42 C.F.R. § 431.10, implementing the Medicaid Act's single state agency requirement, is premised on the same view of the single state agency requirement expressed in the *Handbook.*

In sum, we find no evidence in the text of 42 U.S.C. § 1396a(a)(5), 42 C.F.R. § 431.10(e), or in the legislative and regulatory history that Medicaid providers were the intended beneficiaries of the single state agency requirement within the meaning of *Blessing.*

**B.** *Significance of 42 C.F.R. § 455.23*

Our conclusion that Plaintiffs do not have a right under § 1983 to enforce the single state agency requirement does not completely resolve Defendants' appeal from the district court's summary judgments. Simonyan and Nagapetyan also urge us to affirm on the basis that DHS impermissibly withheld payments from them in violation of 42 C.F.R. § 455.23. As set forth above, 42 C.F.R. § 455.23 pro-

hibits DHS from withholding provider payments unless DHS "recei[ves] reliable evidence" of fraud or willful misrepresentation.

The district court's conclusion that DHS withheld payments in violation of § 455.23 rested on two grounds. The district court ruled that evidence from the Controller's audit was unreliable as a matter of law because the audit resulted from an improper delegation of discretion in violation of the single state agency requirement. Our holding on the single state agency issue eliminates this ground for the district court's ruling.

▮▮▮ We also decline Plaintiffs' invitation to affirm on a second ground. Plaintiffs contend that DHS violated § 455.23 when it failed to "receive" the evidence of fraud and independently evaluate its reliability. They argue that DHS impermissibly relied solely on the FBI's assertion in its letter that the evidence of fraud or misrepresentation was sufficient to withhold the payments.

The record reflects that DHS ultimately obtained and independently evaluated the results of the Controller's audit and other information indicating that Simonyan and Nagapetyan had billed Medi–Cal for providing more goods than they were capable of supplying. DHS concluded that the information constituted reliable evidence of fraud or willful misrepresentation. Plaintiffs do not contend that § 455.23 requires more. Because DHS ultimately complied with § 455.23, this ground for affirming the injunction is without merit.[12]

* * *

In sum, Plaintiffs cannot assert a right enforceable under § 1983. The district court erred in holding to the contrary.

## IV.

### Attorney's Fees

Because Plaintiffs prevailed solely due to the district court's erroneous view of the law, their attorney's fee awards must be reversed. *See Lovell v. Poway Unified Sch. Dist.,* 90 F.3d 367, 373–74 (9th Cir. 1996) ("[b]ecause we have reversed the judgment ... on the merits, [plaintiff] can no longer be considered a prevailing party"); *see also Ward v. County of San Diego,* 791 F.2d 1329, 1334 (9th Cir.1986) ("[a]n erroneously granted injunction cannot be the basis for an award of attorney fees as the prevailing party").

## V.

### Conclusion

We conclude that the district court erred in holding that Plaintiffs can maintain an action under § 1983 to enforce compliance with the single state agency requirement. Accordingly, we reverse the district court's judgments in favor of Plaintiffs Simonyan and Nagapetyan in case no. 00–55377 and Plaintiff Clinical Care in case no. 00–55963, and remand case no. 00–55377 for the district court to enter judgment for Defendants. In *Clinical Care,* although it appears that the district court resolved all of Clinical Care's claims, we cannot be certain. Therefore, we remand case no. 00–55963 to the district court to resolve any remaining claims. Because San Lazaro's claims are moot, we dismiss the appeal in case no. 00–55065. We also reverse the district court's attorney's fee awards in favor of all Plaintiffs. Finally, in *San Lazaro* (case no. 00–55610), the Controller sought attorney's fees following the district court's order vacating the summary judgment. We note that the district court

---

**12.** Because of the resolution of this issue, we do not reach the question of whether 42 C.F.R. § 455.23 creates a private right of action that a provider may enforce under § 1983.

denied the Controller's motion for summary judgment and, having granted San Lazaro's request for attorney's fees, summarily denied the Controller's motion for attorney's fees. We remand case no. 00–55610 to the district court to consider the Controller's request for attorney's fees in light of our ruling.

DISMISSED IN PART, REVERSED IN PART, and REMANDED.