EXETER MEMORIAL HOSPITAL ASSO-
CIATION, a non-profit corporation, dba
Memorial Hospital at Exeter, Plaintiff,

v.

Kimberly BELSHE, Director of the
California Department of Health
Services, Defendant.

CIV–S–96–693 DFL JFM.

United States District Court,
E.D. California.

Oct. 15, 1996.

Byron J. Gross, Gooper, Lundy & Book-
man, Inc., Los Angeles, CA, for Exeter Me-
morial Hospital.

Raoul Thorbourne, Deputy Attorney Gen-
eral, Sacramento, CA, for Belshe.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

The question presented in this case is whether a State may implement a change in the rate of reimbursement to certain Medic-aid providers prior to approval of a State plan amendment by the Secretary of Health and Human Services ("the Secretary"). Plaintiff Exeter Memorial Hospital Associa-tion ("Exeter") seeks a preliminary injunc-tion to compel the California Department of Health Services ("DHS") to cease enforce-ment of its most recent amendment to its Medicaid reimbursement plan, as that amendment is applied to DHS's payments to Exeter.

I.

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., authorizes payment of federal matching funds to States to defray expenses that the States incur in providing medical assistance to low income persons. If a State chooses to participate in this pro-gram, it must comply with the requirements of the Act and of the regulations issued by the Secretary. Central to this litigation and to the structure of the program is the re-quirement that the State submit to the Sec-retary a State plan that sets forth the State's proposal for delivering medical assistance. The State plan must describe the nature and scope of the State's Medicaid program, must conform to an extensive list of substantive statutory requirements, and must give assur-

ances that it will be administered in accordance with the Act and applicable regulations of the Department of Health and Human Services. 42 U.S.C. § 1396a(a) & (b); 42 C.F.R. § 430.10.[1]

The agency responsible for approving State plans is the Health Care Finance Administration ("HCFA"), an arm of the Department of Health and Human Services. The agency's approval of the State plan is a necessary precondition to the State's entitlement to federal funds. 42 U.S.C. §§ 1396, 1396b(a).

The reimbursement rate provided by the State plan to Medicaid providers is addressed at Section 1396a(a)(13)(A) of the Act, known as the Boren Amendment, Pub.L. 96–499, § 962(a), 94 Stat. 2650 (1980). This portion of the statute requires that a State plan for medical assistance must

provide ... for payment ... of nursing facility services ... through the use of rates .. which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities....

42 U.S.C. § 1396a(a)(13)(A).

The Act contemplates that the States may wish to amend their State plans, including the rate structure. Whenever a State seeks to make changes in its approved Medicaid plan, it must submit a State Plan Amendment ("SPA") to HCFA so that HCFA may determine whether the amended State plan continues to comply with federal requirements. 42 C.F.R. § 430.12. If the SPA proposes a change in payment methods and standards, the State must again provide satisfactory assurances to HCFA that the reimbursement rates are adequate under the standards provided in the statute and regulations. 42 C.F.R. §§ 447.253 [2], 447.256. HCFA may approve or disapprove the submitted amendment, or it may request more information before making a determination. 42 C.F.R. § 430.16. If HCFA fails to act upon a submitted amendment within 90 days after its submission, the amendment is deemed approved. 42 C.F.R. § 430.16. A request for more information stops the 90–day clock. 42 C.F.R. § 430.16(a)(2) [3]; 42 C.F.R. § 447.256(b). The 90–day period begins anew when the State submits the requested information.

California's Medicaid program ("Medi–Cal") includes an inpatient hospital level of care known as "subacute" care. Subacute care is for those patients that do not need acute hospital care, but require more attention than they would receive at a skilled nursing facility. 22 C.C.R. § 51124.5(a). Prior to 1995, subacute care reimbursement rates were based on a model developed by DHS. Payments were on a per-diem basis at

1. 42 C.F.R. § 430.10 provides:

The State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of title XIX, the regulations in this Chapter IV, and other applicable official issuances of the Department [of Health and Human Services]. The State plan contains all information necessary for HCFA to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program.

2. 42 C.F.R. § 447.253(a) provides:

In order to receive HCFA approval of a State plan change in payment methods and standards, the Medicaid agency must make assurances satisfactory to HCFA that the requirements set forth in paragraphs (b) through (I) of this section are being met, must submit the related information required by § 447.255 of

this subpart, and must comply with all other requirements of this subpart.

3. Section 430.16 provides:

(a) *Timing.* (1) A State plan or plan amendment will be considered approved unless HCFA, within 90 days after receipt of the plan or plan amendment in the regional office, sends the State—

(i) Written notice of disapproval; or

(ii) Written notice of any additional information it needs in order to make a final determination.

(2) If HCFA requests additional information, the 90–day period for HCFA action on the plan or plan amendment begins on the day it receives that information.

(b) *Notice of final determination.* (1) The Regional Administrator or the Administrator notifies the Medicaid agency of the approval of a State plan or plan amendment.

(2) Only the Administrator gives notice of disapproval of a State plan or plan amendment.

an all-inclusive rate per patient day ("ppd"). One rate was paid for ventilator-dependent patients, and a lower rate was paid for non-ventilator-dependent patients. All hospital-based subacute care providers received the same ppd for each class of patients, while all freestanding subacute care providers received a lower ppd for each class. Prior to the 1995 change, hospital-based subacute care units such as Exeter received a rate of $370.50 ppd for non-ventilator-dependent patients and a rate of $392.22 ppd for ventilator-dependent patients. The pre–1995 rate is referred to as a "modeled" rate, presumably because it draws on a model as opposed to the particular provider's actual costs.

On September 29, 1995, DHS submitted to HCFA State Plan Amendment No. 95–017, which proposed changes to both the Medi-Cal reimbursement rates and the method by which those rates are computed. Under the amendment reimbursement is no longer to be based on the same modeled rates for all like providers. Instead, the rate is the lesser of: (1) each individual facility's actual costs as projected by DHS, based upon the cost reports from the past two years adjusted for inflation; or (2) the prospective class median rate for like providers.

However, DHS discovered that it lacked sufficient data to arrive at accurate total cost figures for subacute care providers. Specifically, DHS lacked information on the cost of "ancillary" services such as speech therapy, occupational therapy, and respiratory therapy. Thus, while arriving at a figure for routine subacute costs based on actual costs reported by providers, DHS arrived at a separate figure for ancillary costs based upon the old "modeled rate" method. The modeled rate for ancillary costs included only physical therapy, occupational therapy, and "other therapy," and was set at $30.49 ppd.

DHS then used a combination of routine costs derived from 1993 numbers, adjusted for inflation, plus the modeled rate for ancillary costs to arrive at a total cost figure for each provider, and a median total cost figure for each class of provider. The total cost

median for subacute rates was $401.08 for non-ventilator-dependent patients and $423.67 for ventilator-dependent patients. If a provider's actual reported costs were lower than this rate, it received an amount equal to its actual costs; if its actual costs were above this rate it received only the median rate. DHS implemented the new methodology on an emergency basis, with the changes to be effective October 16, 1995 for all providers who would see their reimbursement rates fall as a result of the changes.

Exeter's "actual" costs [1993 reported costs adjusted for inflation + modeled ancillary rate] were determined by DHS to be $326.97 for ventilator-dependent patients and $303.37 for non-ventilator-dependent patients—below the median rate. Thus, these rates constituted Exeter's new reimbursement amounts. Exeter claims that the new rates reflect a cut of approximately 20%, amounting to a loss of approximately $84,000 per month.[4]

In December of 1995 HCFA notified DHS that it would not approve SPA 95–017 as submitted, but required more information before approval could be given. HCFA also stated that it would take no action on SPA 95–017 until it received more information on nine previous unapproved California SPA's, dating back to 1991. DHS has kept the new rate structure in place pending HCFA approval. The requested information has not yet been provided by DHS to HCFA. Exeter challenges DHS' implementation of the new rate structure in advance of approval by HCFA.

## II.

The parties agree that a Medicaid provider such as Exeter may bring an action under 42 U.S.C. § 1983 on a claim that the State has violated 42 U.S.C. § 1396a(a)(13)(A) (the Boren Amendment) and the regulations implementing that code section. *See Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Washington State Health Facilities Association v.*

---

4. The majority of Exeter's business is in subacute care, although it maintains other hospital and    clinic services.

*State of Washington DSHS,* 698 F.2d 964, 965 n. 4 (9th Cir.1982). Exeter brings such a claim and requests a preliminary injunction that would require DHS to cease making Medicaid payments to Exeter under SPA 95–017 until such time as that amendment is approved by HCFA.[5] To obtain a preliminary injunction the moving party must demonstrate (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) sufficiently serious questions going to the merits and a balance of hardships tipping sharply in the moving party's favor. *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,* 886 F.2d 1173, 1174 (9th Cir. 1989).

As to the merits, the question presented is one of timing—whether DHS acted consistently with the Boren Amendment and the applicable regulations when it implemented SPA 95–017 prior to obtaining HCFA approval.[6] The parties agree that if HCFA were to disapprove the State plan amendment, the State would be required to reimburse providers under the existing plan and would be required to do so retroactively. Similarly, there is no dispute that if the amendment is ultimately approved the new reimbursement rate may be applied retroactively to the first day of the quarter in which the plan amendment was submitted. 42 C.F.R. § 447.256(c). In short, once HCFA either approves or disapproves the amendment, the reimbursement paid by DHS to the providers will be adjusted as need be; the dispute arises as to what happens in the meantime, once the SPA is submitted but HCFA has not yet either approved nor disapproved the amendment. Exeter contends that the Act requires approval before implementation; DHS argues that it may put its SPA into effect during the time that HCFA approval is pending, assuming the risk that the amendment may be disallowed.

■ Both the statute and implementing regulations suggest that the State may not unilaterally implement a change to the State plan. The Act requires that a State submit a comprehensive medical assistance plan, and obtain HCFA's approval of that plan, prior to receiving federal Medicaid funds. 42 U.S.C. § 1396. The State plan must provide for reimbursement at rates "satisfactory to the Secretary," 42 U.S.C. § 1396a(a)(13)(A), and the State Medicaid agency "must pay for inpatient hospital and long term care services using rates determined in accordance with methods and standards specified in an approved State plan." 42 C.F.R. § 447.253(i). Any amendment to the reimbursement rate must be submitted for approval to HCFA with assurances satisfactory to HCFA that any change in reimbursement rates is consistent with the standards stated in the statute and regulations. In short, the State must pay the rates approved in the State plan and therefore cannot pay rates proposed in an amendment until the proposed amendment has been approved and made part of the State plan. Any other interpretation of the plain language of the statute and regulations would be inconsistent with the centrality of an approved State plan to the structure of the Act.

Further support for the conclusion that the State may not implement changes to the reimbursement rate prior to approval is found in the timing provisions in the regulations. HCFA must act quickly, within 90 days, of submission of a plan amendment or the amendment is deemed approved, and an approved amendment will be effective as of

---

**5.** Exeter attempts to couch its request for injunctive relief in such a manner as to force DHS to make payments to it under the 1994 rates that were in effect until SPA 95–017 was implemented. However, DHS contends that the amendment that established the rates for 1994 has likewise yet to receive HCFA approval. In fact, DHS represents that the most recent SPA that has been approved was SPA 90–18 (from 1990). Because the court concludes that SPA 95–017 cannot be enforced prior to HCFA approval, it will not order the enforcement of previous SPA's that have not yet received such approval. The court's order will be limited to enjoining the continued enforcement of SPA 95–017 with respect to Exeter.

**6.** Exeter makes two additional arguments concerning the invalidity of the new rate structure: (1) that DHS failed to follow procedures compelled by the Boren Amendment when it developed and implemented the new reimbursement rates, and (2) that the new rates fail to meet the substantive requirements of the Boren Amendment. It is not necessary to address these contentions.

the first day of the quarter in which the plan amendment is submitted. 42 C.F.R. § 447.256(c).[7] Thus, the State loses little, if anything, by waiting for HCFA approval before implementing a new rate: the plan amendment will be effective, and can be implemented, within 90 days and can be applied retroactively to the beginning of the calendar quarter. If HCFA requests further information, the State will determine the timing of future review; once the further information is provided HCFA must approve or disapprove in 90 days or the amendment is deemed approved. These provisions protect the State from delay, give the State an incentive to respond promptly to HCFA's requests for information, and thus rebut the practical arguments in favor of immediate implementation of a plan amendment. On the other hand, if, as here, the State fails to provide the information requested by HCFA, the approval process may be derailed for any number of years. To permit implementation during this indefinite period would put a reimbursement rate in place for a considerable time period that had never been approved, that may not be approved, and that may be inadequate under the standards set in the statute and regulations. This would be inconsistent with the function of the State plan, the approval process for State plans and amendments, and the directive that the States "must pay" reimbursement according to the methods specified in an approved State plan.

Ninth Circuit precedent supports the holding that the State may not implement changes to its methods for determining payment rates prior to approval by HCFA. In *Washington State Health Facilities Association v. State of Washington DSHS*, 698 F.2d 964 (9th Cir.1982), the court held that the pre-Boren Amendment Medicaid Act required States to obtain HCFA approval prior to implementing changes to plans with respect to reimbursement of nursing care providers. *Id.* at 965. The court reasoned that because the Act required federal approval before a plan is first implemented, and because the federal regulations set forth a spe-

cific procedure for amending a State plan, a State may not enforce changes in its reimbursement methods without first receiving federal approval. *Id.* Although, as discussed below, the Boren Amendment made several changes to the Act, the reasoning of the Ninth Circuit is not affected by these changes: the Act still requires federal approval before a State plan may be implemented, amendments to the plan must still be approved, and it follows that, like the plan itself, the amendments must be approved before implemented. Indeed, well after the Boren Amendment, the Ninth Circuit applied a similar approach in *Oregon Association of Homes v. State Department of Human Resources*, 5 F.3d 1239 (9th Cir.1993). In holding that Oregon's change in its method of reimbursement for nursing services must be submitted to HCFA for approval, the court reiterated that a "law that effects a change in payment methods or standards without HCFA approval is invalid." *Id.* at 1241 (citing *Washington State Health Facilities*).

DHS makes a number of arguments based on the statute and regulations. The principal argument stems from the Boren Amendment. Prior to the Boren Amendment in 1980, the Act provided at § 1396a(a)(13)(E) that as to skilled nursing and intermediate care facility services a State plan must provide for payment on the basis of "cost-finding methods approved and verified by the Secretary." Prior to the extension of the Boren Amendment in 1981 to inpatient hospital services, § 1396a(a)(13)(D) of the Act, which applies to inpatient hospital services, stated that the State must provide for payment according to "methods and standards" which shall be "reviewed and approved by the Secretary and (after notice of approval by the Secretary) included in the plan."

In an effort to give the States greater flexibility in setting rates, the Boren Amendment, Pub.L. 96–499, § 962(a), 94 Stat. 2650 (1980), amended this language by deleting the requirement that the Secretary approve the States' "methods and standards" or that the States must use "cost-finding methods

---

**7.** 42 U.S.C. § 447.256(c) provides that a "State plan amendment that is approved will become effective not earlier than the first day of the

calendar quarter in which an approvable amendment is submitted."

approved" by the Secretary. Instead, under the Boren Amendment, the State develops its own methods and standards and "makes assurance satisfactory to the Secretary" that the rates are reasonable and adequate. Even with the broader discretion reposed in the States, the Secretary "retain[ed] final authority to review the rates and to disapprove those rates if they do not meet the requirements of the statute." *See* 1981 U.S.Code Cong. & Admin.News at 5944 (Conference agreement).

Some courts have found in this change of language support for the view that the States may implement plan amendments in advance of the Secretary's approval. *See, e.g., California Association of Bioanalysts v. Rank,* 577 F.Supp. 1342, 1360 n. 32 (C.D.Cal.1983); *Illinois Council on Long Term Care v. Miller,* 579 F.Supp. 1140, 1146–47 (N.D.Ill.1983); *Wisconsin Hospital Association v. Reivitz,* 733 F.2d 1226, 1237 (7th Cir.1984); *Magee–Womens Hospital v. Heckler,* 562 F.Supp. 483, 485 (W.D.Pa.1983). There is little logic in this view. The statutory language regarding the timing of implementation of changes to methods of reimbursement of nursing care providers did not change when the Boren Amendment was enacted; the statute has remained silent on the question throughout. *Compare* 42 U.S.C. § 1396a(a)(13)(E) (1979) *with* 42 U.S.C. § 1396a(a)(13)(E) (1980) *and* 42 U.S.C. § 1396a(a)(13)(A) (1992). What has changed is the sort of review that HCFA must conduct prior to giving its approval; the requirement of approval, however, continues for both the plan and plan amendments. A change to the standard of HCFA's review of plans and plan amendments is no basis from which to infer that amendments to a plan may be implemented prior to approval.

DHS also argues that 42 C.F.R. § 447.256(c) allows states to implement plan amendments pending HCFA approval. This regulation provides that "[a] State plan amendment that is approved will become effective not earlier than the first day of the calendar quarter in which an approvable amendment is submitted" to HCFA. 42 C.F.R. § 447.256(c). Several courts have read this provision as allowing implementation of plan amendments pending HCFA approval.[8] However, the plain language of the provision will not bear that interpretation. Instead, § 447.256(c) is naturally read to be consistent with the proposition that plan amendments must be approved prior to any implementation; the regulation provides that a SPA will "become" effective retroactively but only after HCFA approves it.

Finally, DHS contends that the regulations contemplate that HCFA's request for more information operates as "approval" for purposes of SPA implementation. However, the regulations make clear that a plan is "approved" only when HCFA is satisfied with the State's assurances that the amended plan remains in compliance with the Act. *See* 42 C.F.R. § 447.253(a) ("In order to receive HCFA approval of a [SPA], the Medicaid agency must make assurances satisfactory to HCFA that the requirements [set forth in the regulations] are being met"); 42 C.F.R. § 430.16 (a SPA "will be considered approved unless HCFA ... sends the State ... [w]ritten notice of any additional information it needs in order to make a final determination").

The court concludes that the State's implementation of a new rate structure in advance of approval by HCFA is invalid.[9] Accordingly, DHS was in violation of the Act when it implemented SPA 95–017 while HCFA approval was pending.

Having demonstrated a strong likelihood of success on the merits of its challenge

---

8. *See, e.g., Wisconsin Hospital Association v. Reivitz,* 733 F.2d 1226, 1237 (7th Cir.1984); *Multicare Medical Center v. State of Washington,* 768 F.Supp. 1349, 1357 (W.D.Wash.1991).

9. In the amicus brief filed by the Secretary, the Secretary concurs that the State may not implement a change to its reimbursement rates prior to approval by HCFA. The court notes that the Secretary took a different position some years

ago in a different litigation. *See Illinois Council on Long Term Care v. Miller,* 579 F.Supp. 1140, 1147 (N.D.Ill.1983). For this reason, her position now may be entitled to lesser weight. Nonetheless, the amicus brief is helpful in its discussion of the statute and regulations and in its explanation as to why the Secretary rarely pursues a compliance action against a State that implements a SPA pending approval.

to DHS's implementation of SPA 95–017, Exeter must now show at least a "possibility" of irreparable harm should the court deny the preliminary injunctive relief. *See Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,* 886 F.2d 1173, 1174 (9th Cir.1989); *see also Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987) ("the required showing of harm varies inversely with the required showing of meritoriousness"). Exeter contends that its Medi–Cal reimbursement has been reduced under SPA 95–017 by approximately $84,000 per month. *See* Brewer Decl. at ¶ 17. Exeter further contends that it cannot absorb this reduction and will be forced to cease operations if the new rates continue in effect. *See id.* at ¶¶ 18, 20.

While DHS disputes some of these contentions, Exeter has, at the very least, established the "possibility" of irreparable harm if SPA 95–017's rate reductions continue in effect. In light of Exeter's strong showing on the merits, this is enough to warrant preliminary injunctive relief.

### III.

Exeter has demonstrated a strong likelihood of success on the merits of its challenge to the implementation of SPA 95–017, on the grounds that DHS implemented the amendment prior to obtaining HCFA approval. Exeter has demonstrated at least the possibility of irreparable injury if the rate reduction it suffered under SPA 95–017 is not enjoined. For these reasons, Exeter's motion for preliminary injunction is granted. DHS is ordered to cease enforcement of SPA 95–017 with respect to Medicaid payments made to Exeter.

IT IS SO ORDERED.