# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEVELOPMENTAL SERVICES
NETWORK; UNITED CEREBRAL
PALSY/SPASTIC CHILDREN'S
FOUNDATION OF LOS ANGELES AND
VENTURA COUNTIES,
                    *Plaintiff-Appellee,*

v.

TOBY DOUGLAS,* Director of the
Department of Health Care
Services, State of California;
CALIFORNIA DEPARTMENT OF HEALTH
CARE SERVICES,
                    *Defendants-Appellants.*

No. 11-55851

D.C. No.
2:10-cv-03284-
CAS-MAN

---

  *Toby Douglas is the current Director of the California Department of Health Care Services and has, therefore, been automatically substituted for his predecessor, David Maxwell-Jolly. *See* Fed. R. Civ. P. 25(d).

20519

CALIFORNIA ASSOCIATION OF HEALTH
FACILITIES,
                    *Plaintiff-Appellee,*

                    v.

TOBY DOUGLAS, Director of the
Department of Health Care
Services, State of California,
                    *Defendant-Appellant.*

No. 11-55852

D.C. No.
2:10-cv-03259-
CAS-MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
October 12, 2011—Pasadena, California

Filed November 30, 2011

Before: Ferdinand F. Fernandez and Consuelo M. Callahan,
Circuit Judges, and Ralph R. Erickson,** District Judge.

Opinion by Judge Fernandez

---

**The Honorable Ralph R. Erickson, Chief United States District Judge
for the District of North Dakota, sitting by designation.

## COUNSEL

Kenneth K. Wang, Office of the Attorney General of California, Los Angeles, California, and Tracey L. Angelopoulos, Office of the Attorney General of California, San Diego, California, for the defendants-appellants.

Jordan B. Keville and Craig Cannizzo, Hooper, Lundy & Bookman, P.C., San Francisco, California, for the plaintiffs-appellees.

**OPINION**

FERNANDEZ, Circuit Judge:

Toby Douglas, the Director of the California Department of Health Care Services,[1] appeals the district court's preliminary injunction precluding enforcement of California Welfare and Institutions Code § 14105.191(f), which amended California's Medicaid Plan and set provider reimbursement rates for the 2009-2010 rate year, and for each year thereafter. The Developmental Services Network and the United Cerebral Palsy/Spastic Children's Foundation of Los Angeles and Ventura County, and the California Association of Health Facilities[2] challenged the law under 42 U.S.C. § 1983 and the Supremacy Clause[3] because the State did not obtain federal approval of its State Plan Amendment ("SPA") prior to implementing the rate changes. The State argues that the district court abused its discretion in ordering the preliminary injunction because the Providers have not shown a likelihood of success on the merits, or irreparable harm, or that the balance of equities and the public interest warrant an injunction. We vacate the preliminary injunction and remand.

BACKGROUND

The Providers are trade associations representing, among other facilities, intermediate care facilities for the mentally retarded and for the developmentally disabled, and free standing pediatric subacute facilities. The Providers filed suit in federal district court on April 30, 2011. They alleged that the State's implementation of Welfare and Institutions Code § 14105.191(f), which limited reimbursement rates under California's Medicaid program, violated federal law. The section

---

[1]Toby Douglas, as Director, is referred to as "the State" hereafter.

[2]Together, all of these entities are referred to as "the Providers" hereafter.

[3]U.S. Const. art. VI, cl. 2.

amended the State's Medicaid Plan so that the reimbursement rates "for services rendered during the 2009-10 rate year and each rate year thereafter, shall not exceed the reimbursement rates that were applicable to those classes of providers in the 2008-09 rate year." Cal. Welf. & Inst. Code § 14105.191(f). The Providers argued, along with other claims, that implementation of the statute was unlawful because it violated 42 U.S.C. § 1396a(a)(30)(A)'s requirement that the State consider quality of care in setting Medicaid payment rates[4] and because the State implemented the section before obtaining federal approval[5] of what amounted to an amendment of the State Medicaid Plan.[6] The district court then stayed the Providers' cases on June 24, 2010, after the Supreme Court had granted certiorari in two Ninth Circuit cases[7] to consider whether a private party may sue under the Supremacy Clause to enforce 42 U.S.C. § 1396a(a)(30)(A). On March 28, 2011, the district court lifted the stay. The court then granted the motion for a preliminary injunction. It concluded that it was likely that the Providers would succeed on the merits of their 42 U.S.C. § 1983 claim that the State had unlawfully failed to obtain federal approval of the SPA effected by section 14105.191(f) prior to implementing it. In addition, the district court determined that the Providers were likely to suffer irrep-

---

[4]As pertinent here, the section provides that state plans must: "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . ."

[5]To obtain approval of a state Medicaid plan, the state must submit the plan or plan amendment to the Centers for Medicare & Medicaid Services ("CMS"), which is a division of the Department of Health and Human Services ("DHHS"). *See* 42 C.F.R. § 430.12(b), (c).

[6]It still had not been obtained when the district court ruled.

[7]*See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098 (9th Cir. 2010), *cert. granted*, 79 U.S.L.W. 3419 (U.S. Jan. 18, 2011) (No. 09-1158); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644 (9th Cir. 2009), *cert. granted*, 79 U.S.L.W. 3419 (U.S. Jan. 18, 2011) (No. 09-958). The Court limited its review to the Supremacy Clause issue.

arable harm, and that the balance of hardships and the public interest weighed in favor of granting the injunction.[8] After its motion for reconsideration was denied, the State timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

We review the grant of a preliminary injunction for abuse of discretion. *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Our review is "limited and deferential, and [w]e do not review the underlying merits of the case." *Id.* (internal quotation marks omitted). "Nevertheless, a district court necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* (internal quotation marks omitted).

## DISCUSSION

"Plaintiffs seeking a preliminary injunction in a case in which the public interest is involved must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849 (9th Cir. 2009). We have glossed that standard by adding that there is a "sliding scale"[9]

---

[8]The district court did not revisit the Supremacy Clause issue or base its decision on that Clause.

[9]We quote this phrase with some trepidation because we have questioned the use of a "sliding scale" metaphor: "nothing 'slides' " and it is "unnecessary and potentially confusing." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir. 2006) (en banc).

approach which allows a plaintiff to obtain an injunction where he has only shown " 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Nevertheless, if a plaintiff fails to show that he has some chance on the merits, that ends the matter. *Global Horizons, Inc v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007).

Here the State attacks the district court's decision on all four parts of the preliminary injunction test and on other bases as well. We, however, will only consider whether the Providers can succeed on the merits, for, as we will show, our conclusion on that ground requires that we vacate the preliminary injunction and remand for further proceedings. While we agree with the district court that the State was required to obtain approval of the amendment wrought in its Medicaid Plan by section 14105.191(f)'s provisions, we disagree with its determination that the Providers have a cause of action pursuant to 42 U.S.C. § 1983.

## I.   Approval of the Change

**[1]** "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502, 110 S. Ct. 2510, 2513, 110 L. Ed. 2d 455 (1990). "To qualify for federal assistance, a State must submit to the Secretary [of the Department of Health and Human Services] and have approved a 'plan for medical assistance,' § 1396a(a)" that complies with statutory requirements. *Id.* If CMS determines that a state plan or plan amendment does not comply with those requirements, it may deny the state federal funds. 42 C.F.R. §§ 430.15, 430.18; *see also San Lazaro Ass'n, Inc. v. Connell*, 286 F.3d 1088, 1092 (9th Cir. 2002).

The State argues that although it must obtain approval before its Medicaid plan goes into effect, it may make and implement material amendments to the plan before the amendments are approved, even though it is undoubtedly required to submit an SPA to CMS. *See* 42 C.F.R. § 430.12. We disagree with that counterintuitive and banausic argument.

We say counterintuitive because it would be surprising if a state were required to adhere to a complex list of requirements[10] in order to obtain approval of a plan in the first place, but then, perhaps immediately after approval, materially change that plan to its heart's content without first having the changes themselves approved. For example, despite the fact that a plan must "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area,"[11] the State suggests that if it adopted changes that did not meet those requirements, even though it must submit an SPA, it could implement the changes forthwith. We suppose that the law could have been written that way, but we question why it would have been. As it turns out, we have previously held that it was not.

**[2]** Our first foray into this area was over twenty-five years ago. *See Wash. State Health Facilities Ass'n v. Wash. Dep't of Soc. & Health Servs.*, 698 F.2d 964 (9th Cir. 1982) (per curiam). We were then faced with a claim that a state could enforce a state regulation which conflicted with the approved Medicaid plan before it obtained approval of the amendment. *Id.* at 964-65. We would have none of it. We held:

---

[10]*See* 42 U.S.C. § 1396a(a) (setting out more than 80 requirements for plan contents).

[11]42 U.S.C. § 1396a(a)(30)(A).

> We previously have held that proper [DHHS] evaluation and approval is a prerequisite to enforcement of a state Medicaid plan. In addition, federal regulations specify the procedures a state must follow if it wishes to amend provisions of its federally approved plan. Accordingly, we find without merit appellants' contention that [the state] may enforce changes in its method of reimbursing nursing care facilities without receiving federal approval.

*Id.* at 965 (citations and footnote references omitted).

**[3]** Nor was that our only visit to this territory. In 1993, a state, again, insisted that it could change its standards and methods under Medicaid before it submitted an SPA. *Or. Ass'n of Homes for the Aging, Inc. v. Oregon*, 5 F.3d 1239, 1241 (9th Cir. 1993). We rejected that position again. We noted that the state plan must be amended to reflect "material changes in state law, organization, policy, or operation" and that the amendments "must be submitted for . . . approval." *Id.* We went on to point out that: "[a] law that effects a change in payment methods or standards without [DHHS] approval is invalid." *Id.*

Finally, in 1998, we were again required to enter that territory. *See Exeter Mem'l Hosp. Ass'n v. Belshe*, 145 F.3d 1106, 1108 (9th Cir. 1998) (*Exeter II*), *adopting* 943 F. Supp. 1239 (E.D. Cal. 1996) (*Exeter I*). That time the State asked us to hold that it could implement changes before the federal government approved them. *Id.* at 1107. We were no more impressed with the argument than we had been some sixteen years earlier. We rejected it and said:

> Most important, our opinion in *Washington* was premised on the overall statutory framework rather than the particular language of the statute relating to amendments to state plans. That framework required then, and at all relevant times since, that all plans

receive approval by the federal government before they may be implemented, and that all amendments to plans must also be federally approved. In *Washington*, we held that from these requirements logically flows the requirement that amendments to plans be approved before implementation. *See Washington*, 698 F.2d at 965. That conclusion is as valid now as it was then . . . .

*Id.* at 1108. But here we are again. Why?

Well, the State now says that our prior cases were decided when the Boren Amendment[12] was in effect, but that the current version of the statute has removed the Boren Amendment language.[13] No doubt there is some truth in that statement.[14] We, however, fail to see how it makes even a minim of difference for this purpose. The fact remains that the State's obligation to follow the substantive provisions of 42 U.S.C. § 1396a

---

[12]The Boren Amendment, previously codified at 42 U.S.C. § 1396a(a)(13)(E), required that the state plan provide for payment to skilled nursing facilities and intermediate care services:

which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards . . . .

*Omnibus Reconciliation Act of 1980*, Pub. L. No. 96-499, § 962, 94 Stat. 2599, 2650-51; *see also Exeter II*, 145 Fd. 3d at 1108 n.1.

[13]The current version of § 1396a(a)(13) no longer requires a state to make "assurances" that its reimbursement rates will achieve certain objectives. Rather, a state now must provide "a public process for determination of rates of payment" for nursing facilities, and intermediate care facilities that allows for provider participation. *See* § 1396a(a)(13)(A) (2006).

[14]Our first foray did refer to the Boren Amendment, but it also referred to the pre-Boren Amendment statute. *Washington*, 698 F.3d at 965. Nevertheless, in *Exeter II*, 145 F.3d at 1108, we deemed *Washington* to be addressing the law under the Boren Amendment, for whatever that was worth.

did not change;[15] nor has there been a material change in regulations regarding the submission of amendments.[16] And as we carefully explained in *Exeter II*, 145 F.3d at 1108, the framework in place made it apparent that just as all plans require federal approval, "all amendments to plans must also be federally approved." *Id.* And that must occur "before implementation." *Id.*

**[4]** Thus, we repeat an old refrain: the State was obligated to submit and obtain approval of its SPA before implementation. But that leads us to the next question before us, and there the Boren Amendment repeal has a bit more bite.

## II.   Cause of Action Under Section 1983

**[5]** It is pellucid that the mere fact that an action by the State, like obtaining approval of a SPA before implementation, is required does not mean that the Providers have a cause of action under § 1983. *See San Lazaro*, 286 F.3d at 1097 ("'[i]n order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.' "). Moreover, it is well known that when Congress repealed the Boren Amendment, it hoped to reduce litigation, which would clog the system, and "[i]n doing so, Congress intended that there be no 'cause of action for [providers] relative to the adequacy of the rates they receive.' " *Alaska Department of Health*, 424 F.3d at 941. Because *Washington*,[17] *Homes for the Aging*,[18] and *Exeter II*[19] were decided on the law as it existed before the Boren Amendment was

---

[15]*See Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 941 (9th Cir. 2005).

[16]*See* 45 C.F.R. §§ 201.3-201.7 (2010); *see also* 45 C.F.R. §§ 201.3-201.7 (1979).

[17]698 F.2d at 964.

[18]5 F.3d at 1239.

[19]145 F.3d at 1106.

repealed, that does give some pause, although it is not dispositive.

**[6]** More important is the relatively recent refinement of federal law by the Supreme Court. As the Court noted, when our court considered a claim that plaintiffs were entitled to child support services, we had held that a right of action was based on the overall scheme of the statute in question. *Blessing v. Freestone*, 520 U.S. 329, 332-33, 117 S. Ct. 1353, 1356, 137 L. Ed. 2d 569 (1997). The Court eschewed that approach and declared:

> In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*. We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340-41, 117 S. Ct. at 1359 (citations omitted). The Court vacated our decision. *Id.* at 349, 117 S. Ct. at 1363. Lest there be any doubt, the Court returned to the issue a few years later. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). There, the Court emphasized: "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283, 122 S. Ct. at 2275. And it concluded by stating that if Congress wants to create "new rights enforceable under § 1983, it must do so in clear and

unambiguous terms . . . ." *Id.* at 290, 122 S. Ct. at 2279; *see also Watson v. Weeks*, 436 F.3d 1152, 1158-59 (9th Cir. 2006); *Sanchez v. Johnson*, 416 F.3d 1051, 1059-60 (9th Cir. 2005).

We do not overlook the fact that *Washington*[20] and *Homes for the Aging*[21] did allow for a § 1983 action, but neither actually discussed the question about what specific provision conferred a cause of action upon providers; they were quite general, even ambiguous, in that regard. In fact, in *Exeter I*,[22] which we adopted in *Exeter II*,[23] the district court stated that the parties had agreed that a § 1983 action was available.[24] For our part, we made it quite clear that *Washington* was decided based upon "the overall statutory framework rather than the particular language of the statute." *Exeter II*, 145 F.3d at 1108. Also, while *Exeter II* itself was issued after *Blessing*, its adoption of *Exeter I* demonstrates that it was not really focused on the question of whether a § 1983 action was available, and, of course, it came before the added clarification in *Gonzaga University*.

[7] Therefore, when we consider Congress' intent in repealing the Boren Amendment, the fact that no provision appears to unambiguously confer a right upon the Providers, the fact that the requirement of the submission of SPAs to the federal authority appears to be a general[25] or administrative[26]

---

[20]698 F.2d at 965 n.4. We recognize that the court also relied upon agency regulations, but regulations alone cannot create rights enforceable under § 1983. *See Guzman v. Shewry*, 552 F.3d 941, 952 (9th Cir. 2009).

[21]5 F.3d at 1241.

[22]943 F. Supp. at 1239.

[23]145 F.3d at 1108.

[24]943 F. Supp. at 1241.

[25]*See Sanchez*, 416 F.3d at 1059-60 (finding no right to enforce 42 U.S.C. § 1396a(a)(30)(A)).

[26]*San Lazaro*, 286 F.3d at 1099 (finding no right to enforce single state agency requirement).

provision rather than one which confers individual entitlements, and the fact that our prior cases do not require a different decision under the circumstances, we are constrained to the view that notwithstanding our prior cases,[27] no individual right has been created for the Providers.[28]

The Providers also argue that the federal authorities are of the opinion that SPAs must be approved before they are implemented, a proposition with which we agree. But, as we have already noted, an agency cannot create a right enforceable through § 1983 where Congress has not done so. *See Guzman*, 552 F.3d at 952; *Save Our Valley v. Sound Transit*, 335 F.3d 932, 939 (9th Cir. 2003). Nor is there a basis for deciding that an agency can accomplish the same result by taking a litigating position as an amicus in one or more cases, or by issuing dire warnings that a private individual might sue.

[8]  In fine, the Providers have not shown that they have an unambiguously conferred right to bring a § 1983 action. That being so, we must hold that there is no likelihood of success on the merits and that the preliminary injunction cannot stand.[29]

---

[27]*Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) (panel can deem prior opinions of the court to be "effectively overruled").

[28]We have not overlooked the Providers' claim that the so called "*Suter* fix" shows that they can bring an action here. *See* 42 U.S.C. §§ 1320a-2, 1320a-10; *Suter v. Artist M.*, 503 U.S. 347, 112 S. Ct. 1360, 118 L. Ed. 2d 1 (1992). But those provisions make it clear that they are not intended to "expand the grounds for determining the availability of private actions to enforce State plan requirements . . . ." 42 U.S.C. §§ 1320a-2, 1320a-10. They do not help to answer the question before us, which is, precisely, whether a private action is available.

[29]The Providers and the State each devote a small handful of pages to the question of whether the injunction can be upheld under the Supremacy Clause. We decline to decide that issue. The district court expressly refused to proceed on that basis, and it should decide the issue in the first instance. *See Am. Trucking*, 559 F.3d at 1060; *see also Warren v. Comm'r*, 302 F.3d 1012, 1015 (9th Cir. 2002). Moreover, because the Supremacy

*See Global Horizons*, 510 F.3d at 1058; *Gonzales v. DHS*, 508 F.3d 1227, 1242 (9th Cir. 2007).

## CONCLUSION

**[9]** Despite our contrary holdings over the past decades, the State has allowed its economic difficulties to obnebulate its analysis and render it purblind to the simple fact that it cannot properly implement changes to its Medicaid plan before the federal government (DHHS through CMS at this time) has approved a submitted SPA. Yet, while it is regrettable that the State refuses to abide by the *law*, that does not mean that a *right* which will support a cause of action under § 1983 has been unambiguously conferred upon the Providers; they cannot maintain an action under that section. Therefore, we must vacate the preliminary injunction.

VACATED and REMANDED.

---

Clause issue is now before the Supreme Court, *see* n.7, *supra*, prudence suggests that consideration of the issue should be put off for another day. After all, the preliminary injunction order did not even touch on that issue. We also see no reason to take up other issues raised by the State; they would not affect our ultimate decision.