**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE ARC OF CALIFORNIA; UNITED CEREBRAL PALSY ASSOCIATION OF SAN DIEGO, *Plaintiffs-Appellants*, <br><br> v. <br><br> TOBY DOUGLAS, Director of the California Department of Health Care Services; CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES; TERRI DELGADILLO, Director of the California Department of Developmental Services; CALIFORNIA DEPARTMENT OF DEVELOPMENTAL SERVICES; DOES, 1-100, inclusive, *Defendants-Appellees*. | No. 13-16544 <br><br> D.C. No. 2:11-cv-02545-MCE-CKD <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., Chief District Judge, Presiding

Argued and Submitted
March 13, 2014—San Francisco, California

Filed June 30, 2014

Before: Sidney R. Thomas, Raymond C. Fisher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Medicaid Act / Preliminary Injunction

The panel dismissed an appeal in part as moot and reversed in part the district court's denial of a motion for a preliminary injunction and its dismissal of Medicaid Act claims brought by non-profit organizations representing developmentally disabled persons, their families, and the organizations that serve them.

The plaintiffs sought preliminary injunctive relief against the continued enforcement of California statutes reducing the state's compensation, partially funded under the Medicaid Act, of home- and community-based services provided to developmentally disabled persons. Those statutes included a "percentage payment reduction," a "uniform holiday schedule," and a "half-day billing rule." The plaintiffs claimed, among other things, that California's implementation of those statutes was inconsistent with the Medicaid Act.

The panel held that because the percentage payment reduction, the primary state statute challenged by the

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

plaintiffs, expired while the case was on appeal, that challenge was moot. The panel held that as to the other two statutes, the district court abused its discretion in denying the plaintiffs' motion for a preliminary injunction, because it misconstrued the Medicaid Act and applied deference to a federal agency decision where none was due. The panel also asserted pendent appellate jurisdiction over the dismissal of the plaintiffs' Medicaid Act claims, and reversed.

The panel held that California's implementation of the half-day billing rule and uniform holiday schedule was inconsistent with the Medicaid Act because the state failed to study the effect of those reductions, as required by Section 30(A) of the Medicaid Act. The panel held that the district court erred in construing the Centers for Medicare and Medicaid Services' approval of California's "HCBS" waiver renewal application, allowing a variety of noninstitutional care options, as a determination that California's payment reductions complied with the Medicaid Act, and in viewing that approval as an agency decision entitled to judicial deference.

The panel concluded that clearly erroneous factfinding marred the district court's evaluation of the irreparable harms facing the plaintiffs. The panel concluded that the current record was inadequate to adjudge whether the impact of the half-day billing rule and uniform holiday schedule amounted to irreparable harm. It remanded to allow augmentation of the record and reconsideration of the propriety of injunctive relief in the changed circumstances, applying the correct irreparable harm analysis.

**COUNSEL**

Chad Carlock (argued), Law Offices of Chad Carlock, Davis, California, for Plaintiffs-Appellants.

Rebecca M. Armstrong (argued), Deputy Attorney General, Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Niromi W. Pfeiffer, Supervising Deputy Attorney General, Grant Lien and Brenda A. Ray, Deputy Attorneys General, California Department of Justice, Sacramento, California, for Defendants-Appellees.

**OPINION**

BERZON, Circuit Judge:

This case concerns California's generous program of home- and community-based care for developmentally disabled residents. To fund its program, California relies in large part on federal money provided under the Medicaid Act ("the Act"), 42 U.S.C. §§ 1396–1396w-5. California has reduced the funding for this program, as it has for other Medicaid-funded programs at various times, and, as in the past, affected groups have challenged the reductions. We therefore are obliged to address once again the scope of the state's federal obligations under the Act to compensate for covered services. *See, e.g.*, *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235 (9th Cir. 2013); *Developmental Servs. Network v. Douglas*, 666 F.3d 540 (9th Cir. 2011).

In this instance, beginning in 2009, the California legislature enacted a series of statutes reducing the state's compensation, partially funded under the federal Medicaid

Act, of home- and community-based services provided to developmentally disabled persons. The plaintiffs in this case, Arc of California and the United Cerebral Palsy Association of San Diego (together, "Arc") — non-profit organizations representing developmentally disabled persons, their families, and the organizations that serve them — allege that California's implementation of those statutes was inconsistent with the Medicaid Act; violated the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the federal Rehabilitation Act, 29 U.S.C. § 794(a); and was invalid under California's Lanterman Developmental Disabilities Services Act, Cal. Welf. & Inst. Code §§ 4500–4869. Arc sought preliminary injunctive relief against the continued enforcement of California's recently enacted statutes. The district court denied that motion and, in a simultaneously released order, dismissed Arc's Medicaid Act claims, reasoning that those claims are meritless and that Arc had not demonstrated a likelihood of irreparable harm.

We hold that the district court abused its discretion in denying Arc's motion for a preliminary injunction, because it misconstrued the Medicaid Act and applied deference to a federal agency decision where none was due. We also assert pendent appellate jurisdiction over the dismissal of Arc's Medicaid Act claims, which relied on exactly the same reasoning, and reverse.

We cannot on this appeal, however, go beyond correcting the district court's statutory interpretation to determining the propriety of preliminary injunctive relief. The primary state statute Arc challenges expired while the case was on appeal, so that challenge is moot. While the two other challenged statutes remain in effect, their impact was not the focus of the preliminary injunction proceeding. The current record is

therefore inadequate to adjudge whether that impact amounts to irreparable harm.    We therefore remand to allow augmentation of the record and reconsideration of the propriety of injunctive relief in the changed circumstances, applying the correct irreparable harm analysis.

## I.

California established under its Lanterman Act, Cal. Welf. & Inst. Code §§ 4500–4869, a comprehensive statutory scheme that seeks

> "to prevent or minimize the institu-tionalization of developmentally disabled persons and their dislocation from family and community, and to enable them to approx-imate the pattern of everyday living of non-disabled persons of the same age and to lead more independent and productive lives in the community."

*Sanchez v. Johnson*, 416 F.3d 1051, 1064 (9th Cir. 2005) (quoting *Ass'n for Retarded Citizens v. Dep't of Developmental Servs.*, 696 P.2d 150, 154 (Cal. 1985)).

Under the Lanterman Act, developmentally disabled persons receive services through providers under contract with a "regional center."    Cal. Code Regs. tit. 17, §§ 50602(n)–(o), 54010.  A regional center is "a diagnostic, counseling, and service coordination center for developmentally disabled persons and their families" that operates as a "private nonprofit community agency or corporation acting as a contracting agency." Cal. Code Regs. tit. 17, § 54302(a)(54).  Regional centers receive funding

from the state, among other sources. *See* Cal. Welf. & Inst. Code §§ 4620, 4659.

California, in turn, receives some of the funding for its Lanterman Act programs through the federal Medicaid program. *See* Cal. Welf. & Inst. Code § 4659(a)(1). State participation in Medicaid is not compulsory, but participating states must comply with the Act and the regulations that implement it. *See, e.g.*, *Managed Pharmacy Care*, 716 F.3d at 1241. The Act conditions receipt of federal funds on approval of a "state plan," *see, e.g.*, 42 U.S.C. §§ 1396-1, 1396b(a), which "is a comprehensive written statement submitted by the [state] agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity" with the Act and its accompanying regulations, 42 C.F.R. § 430.10. The Secretary of the Department of Health and Human Services ("Secretary") administers the Act, *see, e.g.*, *Managed Pharmacy Care*, 716 F.3d at 1241; 42 U.S.C. § 1396a(b), but has delegated to the regional administrator for the Centers for Medicare and Medicaid Services ("CMS") the responsibility of reviewing in the first instance state plans for compliance with the provisions of the Act, *see* 42 C.F.R. § 430.15(b). The Secretary also requires the submission of state plan amendments ("SPAs") for certain changes to a state plan, which CMS again reviews in the first instance for compliance with the Act. *See* 42 C.F.R. § 430.12(c).

The Medicaid Act authorizes the Secretary to waive certain of the Act's otherwise-applicable requirements by granting a so-called home- and community-based services

("HCBS") waiver. *See* 42 U.S.C. § 1396n(c). That waiver provision originated

> [i]n 1981, in response to the fact that a disproportionate percentage of Medicaid resources were being used for long-term institutional care and studies showing that many persons residing in Medicaid-funded institutions would be capable of living at home or in the community if additional support services were available . . . . The HCBS program allows a variety of noninstitutional care options for persons who would otherwise be eligible for Medicaid benefits in an institution, but who would prefer to live at home or in the community.

*Sanchez*, 416 F.3d at 1054. As with state plans, the Secretary has delegated to CMS responsibility for reviewing HCBS waiver requests in the first instance, to determine compliance with applicable statutes and their regulations. *See* 42 C.F.R. § 430.25(f).

California participates in Medicaid via a state plan that includes an HCBS waiver. In late June 2011, California submitted an application to renew its HCBS waiver for the five-year period between 2011 and 2016. CMS ultimately approved the application, after extending the previous waiver renewal, in a two-page letter.

Plaintiffs are two non-profit organizations whose members are developmentally disabled individuals, their families, and providers of home- and community-based services under the Lanterman Act program. They challenge

state officials' implementation of three new policies relating to state funding of home- and community-based services to developmentally disabled persons, adopted in a series of statutes enacted beginning in 2009.

First, the California legislature directed regional centers to reduce funding for services provided under the Lanterman Act by three percent. *See* 2009 Cal. Stat. 4296, 4306, § 10(a). That statute, which we will refer to as the "percentage payment reduction," was initially set to expire on June 30, 2010. *Id.* In three subsequent acts, the California legislature extended the expiration date of, and modified the magnitude of, the percentage payment reduction, first up to 4.25 percent and later down to 1.25 percent. *See* 2010 Cal. Stat. 4718, 4811, § 164; 2011 Cal. Stat. 1640, 1662, § 24; 2012 Cal. Stat. 1056, 1087, § 34. Each iteration of the statute included an exemption authorizing regional centers to avoid the percentage payment reduction upon demonstrating that "a nonreduced payment is necessary to protect the health and safety of the individual for whom the services and supports are proposed to be purchased, and the State Department of Developmental Services has granted prior written approval." 2009 Cal. Stat. 4296, 4306, § 10(a); 2010 Cal. Stat. 4718, 4811, § 164; 2011 Cal. Stat. 1640, 1662, § 24; 2012 Cal. Stat. 1056, 1087, § 34. The percentage payment reduction expired on June 30, 2013, while this appeal was pending but before we took the case under submission, and was not reenacted. *See* 2012 Cal. Stat. 1056, 1087, § 34.

Second, the California legislature mandated what the parties term the "uniform holiday schedule." 2009 Cal. Stat. 5144, 5173, § 26 (codified at Cal. Welf. & Inst. Code § 4692). That provision precludes regional centers from compensating many services rendered on 14 enumerated days

over the course of each year. *See* Cal. Welf. & Inst. Code § 4692(a)–(b).

Third, the California legislature enacted what the parties have dubbed the "half-day billing rule." 2011 Cal. Stat. 1640, 1659–60, § 21 (codified at Cal. Welf. & Inst. Code § 4690.6). That rule generally requires service providers seeking reimbursement for providing services at certain types of facilities for less than 65 percent of an approved program day to charge the state for a half day of service, rather than a full day. Cal. Welf. & Inst. Code § 4690.6(b).

State officials deposed in this litigation acknowledged that the state neither conducted nor relied upon any study to evaluate the effects of these three policies on home- and community-based service providers or on the developmentally disabled persons they serve. Nor does the record indicate that California ever submitted an SPA to CMS before implementing any of these new policies.

Arc has submitted numerous declarations from home- and community-based service providers for the developmentally disabled, stating that the cumulative effect of the three payment reductions has compromised their financial viability and forced them to reduce their services, to the detriment of their clients. Arc has also submitted declarations from several family members of developmentally disabled people, who agree that payment reductions have negatively affected the quality of the services upon which they and their disabled family members rely.

The state officials, for their part, dispute these assertions. They offer evidence that only two of the many declarants receiving services under the Lanterman Act formally

complained about the quality of their care, and no regional center sought a health and safety exemption under the percentage payment reduction statute on behalf of any of the declarants.  They also indicate that the rate of reported injuries, accidents, and other adverse events for developmentally disabled persons receiving care under the Lanterman Act has decreased slightly since California implemented its new policies.

Arc initiated this lawsuit in late September 2011, alleging that California's implementation of its new policies was inconsistent with the Medicaid Act, violated the federal ADA and Rehabilitation Acts, and violated the Lanterman Act.  It first sought a preliminary injunction the following month.  The state officials subsequently moved to stay proceedings pending the Supreme Court's grant of certiorari in the cases later remanded under the name *Douglas v. Independent Living Center of Southern California, Inc.*, 132 S. Ct. 1204 (2012) ("*ILC II*").[1]  The district court granted the stay and denied the motion for a preliminary injunction without prejudice.  After *ILC II* issued, Arc moved to lift the stay.  The district court did not rule on that motion, and Arc renewed it in mid-July.  Over a month later, the district court lifted the stay, and granted leave for limited discovery for the purposes of supporting a motion for preliminary injunctive relief.

---

[1] The Supreme Court granted certiorari in the cases consolidated in *ILC II* "to decide whether Medicaid providers and recipients may maintain a cause of action under the Supremacy Clause to enforce a federal Medicaid law . . . that, in their view, conflicts with (and pre-empts) state Medicaid statutes that reduce payments to providers."  *Id.* at 1207.  Changed circumstances, however, prevented the Supreme Court from addressing the question on which it had granted certiorari.  *See id.*

In late September 2012, the state officials filed a motion to dismiss. Several months later, Arc filed the operative motion for a preliminary injunction on the basis of its Medicaid Act, ADA, and Rehabilitation Act claims.[2] The district court heard oral argument on the motion for a preliminary injunction and the motion to dismiss in late January 2013. On July 1, 2013, the district court issued two orders, one denying Arc's motion for a preliminary injunction, the other dismissing Arc's Medicaid Act claims but allowing its remaining claims to move forward. This timely appeal followed.

## II.

At the outset, we hold that the expiration of the statute enacting California's percentage payment reduction moots Arc's challenges to it, although its challenges to the uniform holiday schedule and half-day billing rule, neither of which has expired, remain live.

Ordinarily, a claim is moot on appeal if it "'loses its character as a live controversy,'" *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1017 (9th Cir. 2013) (quoting *Doe v. Madison Sch. Dist. No. 321*, 117 F.3d 789, 797–98 (9th Cir. 1999)), such that "'there is no longer a possibility that an appellant can obtain relief for his claim,'" *Li v. Kerry*, 710 F.3d 995, 1001 (9th Cir. 2013) (quoting *Ruvalcaba v. City of L.A.*, 167 F.3d 14, 521 (9th Cir. 1999)). Because the percentage payment reduction has expired, there is nothing left to enjoin. This conclusion is consistent with

---

[2] Arc did not move for preliminary injunctive relief on the basis of its pendent state law claims under the Lanterman Act. The district court thus did not address them. Neither do we.

the "general rule [that], if a challenged law is repealed or expires, the case becomes moot." *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994).

Arc replies that its challenge to the percentage rate reductions is not moot, relying on the exception to the mootness doctrine for cases that

> fall[] within a special category of disputes that are "capable of repetition" while "evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). A dispute falls into that category, and a case based on that dispute remains live, if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam).

*Turner v. Rogers*, 131 S. Ct. 2507, 2514–15 (2011) (second, third, and fourth alteration in original). Because the percentage payment reduction is not reasonably likely to recur, we need not decide whether such reductions are inherently of such short duration that they evade review.

As to repetition, Arc contends that the California legislature's previous reenactments of the percentage payment reduction render reasonable the expectation of its recurrence. *See, e.g.*, *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 787 (9th Cir. 2012); *Alaska Cntr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999). Here,

however, the predictive power of the legislature's past conduct is overshadowed by two other considerations, taken together.

First, we have hesitated to hold reasonable the expectation that complex political action motivated by fiscal scarcity will recur. *Foster v. Carson* rejected as unreasonable the expectation that Oregon would reenact a judicial-budget austerity measure that suspended for four months the proceedings of certain indigent criminal defendants, as well as their access to counsel. 347 F.3d 742, 744, 748 (9th Cir. 2003). It reasoned, in part, that

> [t]he economic condition of the state is constantly fluctuating. How the political branches of the state will choose to fund indigent defense, how many indigent defendants will require services, whether a shortfall will occur, and how the state judicial system would address such a shortfall are all unknown. We therefore cannot say that there is a "reasonable expectation" that . . . [a similar austerity measure] will be issued again in the future.

*Id.* at 748. *Foster* suggests that where, as here, challenged conduct requires the confluence of a series of complicated political and fiscal contingencies, the probability of its recurrence to some extent decreases.

Second, our resolution of Arc's remaining challenges also contributes to our conclusion that this sort of percentage rate reduction is unlikely to recur. As explained below, we hold that Arc is likely to succeed on their challenges to

California's uniform holiday schedule and half-day billing rule, as California has taken no steps to comply with Section 30(A) with regard to them.  Those policies have not expired, and Arc's primary procedural challenge to them is nearly identical to its objections to the now-expired rate reductions.  Given our construction of the law as it relates to those parallel claims, "[w]e cannot reasonably expect that [California] will ignore" its legal obligations, which we clarify in this opinion. *Cal. Ass'n*, 738 F.3d at 1018.

We turn now to those parallel claims.

## III.

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).  We evaluate these factors via a "sliding scale approach," such that "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1131, 1135.

We review for abuse of discretion the district court's denial of a preliminary injunction.  *Id.* at 1131.  A district court abuses its discretion when its decision relies "'on an erroneous legal standard or clearly erroneous finding of fact.'"  *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981,

986 (9th Cir. 2008) (en banc)). "When the district court bases its decision on an erroneous legal standard, we review the underlying issues of law de novo." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 817 (9th Cir. 2013). A factual finding constitutes clear error if it is "'illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

We hold that the district court in this case abused its discretion when it denied a preliminary injunction. Its evaluation of Arc's likelihood of success on the merits relied on erroneous legal standards. And it premised its analysis of irreparable harm and balancing of the equities on factual findings that were either illogical or lacked support in the record. We thus reverse the district court but, because of the changed circumstances brought about by the mootness of the percentage payment reduction challenge, remand the matter for its reconsideration.

## A.

Arc argues that California's implementation of its half-day billing rule and uniform holiday schedule was inconsistent with the Medicaid Act, because the state failed entirely to study the effects of those reductions, as required by Section 30(A) of the Medicaid Act.[3] The district court

---

[3] The state officials suggest that, even if the state did violate the Medicaid Act when it enacted the compensation changes to the HCBS waiver program, the challenge cannot go forward, citing *ILC II*, 132 S. Ct. 1204. Not so. "[A] private party may bring suit under the Supremacy Clause to enjoin implementation of state legislation allegedly preempted

rejected that argument, construing CMS's approval of California's 2011–2016 waiver renewal application as a determination that California's payment reductions complied with the Medicaid Act, and viewing that approval as an agency decision entitled to judicial deference. In doing so, the district court misconstrued the Medicaid Act and deferred to an agency determination that did not address, even implicitly, the questions raised in the district court and here.[4]

---

by federal law." *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1065 (9th Cir. 2008) ("*ILC I*"). *ILC II* vacated, on the basis of changed circumstances, the seven judgments of this court over which the Supreme Court had exercised jurisdiction, expressly reserving the question we decided in *ILC I. See ILC II*, 132 S. Ct. at 1211. *ILC I*, over which the Supreme Court had previously *denied* certiorari, 557 U.S. 920 (2009), was not among those vacated decisions, *see ILC II*, 132 S. Ct. at 1209. *ILC I* thus remains the law of this Circuit, and we continue to follow it. *See Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1031–32 & n.5 (9th Cir. 2013).

[4] Arc also argued that California failed to obtain CMS's approval of the payment reductions before implementing policies that affected the payments service providers received under its plan. For over thirty years, we have repeatedly held that a state must submit such an SPA and obtain approval *before* implementing any material change in a plan. *See Developmental Servs.*, 666 F.3d at 545–46 (collecting cases); *see also* 42 C.F.R. § 430.12(c)(1)(ii). Consequently, "'[a state] law that effects a change in payment methods or standards without [federal] approval is invalid.'" *Developmental Servs.*, 666 F.3d at 545 (quoting *Or. Ass'n of Homes for the Aging, Inc. v. Oregon*, 5 F.3d 1239, 1241 (9th Cir. 1993), *abrogation on other grounds recognized by Developmental Servs. Network*, 666 F.3d at 547). Because we conclude that the district court abused its discretion in its legal analysis of the Section 30(A) issue, and because the prior approval claim was not raised affirmatively on appeal, independently of the Section 30(A) question, we do not reach the prior approval claim at this juncture.

**1.** Section 30(A) of the Medicaid Act conditions a state's receipt of Medicaid funds on its provision of

> such methods and procedures relating to the utilization of, and the payment for, care and services available under the [state Medicaid] plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A).

The district court began its legal analysis of Arc's likelihood of success on the merits by accepting the state officials' position that a state participating in the HCBS program, via an HCBS waiver, need not comply with Section 30(A) with regard to the HCBS program. That proposition is incorrect.

The Medicaid Act conditions receipt of federal funds on a state's compliance with "a laundry list of requirements that [a] state plan 'must' satisfy, 42 U.S.C. § 1396a(a), and an extensive body of regulations implements these requirements." *Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 935 (9th Cir. 2005). Congress included Section 30(A) on that laundry list of requirements. *See* 42 U.S.C. § 1396a(a)(30)(A).

Alongside Section 30(A) are three other rules pertinent to the HCBS waiver program:

  1.  The "statewideness" rule, which requires a state plan to "provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them."    42 U.S.C. § 1396a(a)(1).

  2.  The "comparability" rule, which prohibits a state plan from providing certain specified recipients of medical services with services that are "less in amount, duration, or scope than the medical assistance made available to" other recipients of services under the plan. 42 U.S.C. § 1396a(a)(10)(B).

  3.  Various income and resource rules, which restrict services to the very neediest members of the community.    *See* 42 U.S.C. § 1396a(a)(10)(C)(i)(III).

Under some circumstances, the Medicaid Act authorizes the Secretary to waive a state plan's compliance with certain of the Act's otherwise-mandatory statutory requirements. *See* 42 U.S.C. § 1396n(b)–(e). "Waivers are intended to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of beneficiaries." 42 C.F.R. § 430.25(b).   This appeal implicates one such

statutory waiver, the HCBS waiver. *See* 42 U.S.C. § 1396n(c).

The Medicaid Act provision governing HCBS waivers specifies that

> [a] waiver granted under this subsection [authorizing home- and community-based services waivers] may include a waiver of the requirements of section 1396a(a)(1) of this title (relating to statewideness), section 1396a(a)(10)(B) of this title (relating to comparability), and section 1396a(a)(10)(C)(i)(III) of this title (relating to income and resource rules applicable in the community).

42 U.S.C. § 1396n(c)(3); *see also* 42 C.F.R. § 430.25(d)(2) (listing only these three provisions as those which "may be waived"). Thus, the Medicaid Act's authorization of HCBS waivers permits the Secretary, by granting such a waiver, to relieve a state from compliance with three — and only three — of the otherwise-mandatory requirements on which the Medicaid Act conditions receipt of federal funds.[5]

The list of waivable requirements in 42 U.S.C. § 1396n(c)(3) is exclusive. Nothing in the HCBS waiver provision provides the Secretary with authority to waive any *other* of the Medicaid Act's requirements when granting an

---

[5] The statute also conditions the grant of an HCBS waiver on, inter alia, assurance that the state will provide safeguards to protect the health and welfare of beneficiaries, as well as cost-neutrality and certain financial oversight measures. *See* 42 U.S.C. § 1396n(c)(2). The Secretary implements these requirements via 42 C.F.R. §§ 441.300–441.310.

HCBS waiver. The "'presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions'" thus comes into play. *Silvers v. Sony Pictures Entm't*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (quoting *Boudette v. Barnette*, 923 F.2d 754, 756–57 (9th Cir. 1991)). Although that presumption may be rebutted, *see, e.g.*, *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013), two features of this statute convince us that the presumption is particularly appropriate here.

First, a comparison with the language of the surrounding statutory subsections confirms that an HCBS waiver may relieve a state of compliance with *only* the three otherwise-mandatory requirements referenced in 42 U.S.C. § 1396n(c)(3). Consider 42 U.S.C. § 1396n(b), which authorizes waivers designed to promote cost-effectiveness and efficiency. That subsection provides that

> [t]he Secretary, to the extent he finds it to be cost-effective and efficient and not inconsistent with the purposes of this subchapter, may waive such requirements of section 1396a of this title . . . (*other than* sections 1396a(a)(15), 1396a(bb), and 1396a(a)(10)(A) of this title insofar as it requires provision of the care and services described in section 1396d(a)(2)(C) of this title) as may be necessary.

42 U.S.C. § 1396n(b) (emphasis added); *see also* 42 C.F.R. § 431.55(a) ("Section 1915(b) of the Act authorizes the Secretary to waive most requirements of section 1902 of the Act to the extent he or she finds proposed improvements or

specified practices in the provision of services under Medicaid to be cost effective, efficient, and consistent with the objectives of the Medicaid program."). Section 1396n(b) is thus structured exactly inversely to the HCBS waiver provision; it authorizes the waiver of *any* otherwise-applicable requirement, except three. The existence of 42 U.S.C. § 1396n(b) one paragraph above the subsection authorizing HCBS waivers demonstrates that Congress carefully structured the statute to allow broad waivers in some instances and not others. *See, e.g.*, *United States v. Yazzie*, 743 F.3d 1278, 1292 (9th Cir. 2014). Far from authorizing a broad waiver for HCBS services, Congress instead chose for that purpose a narrowly circumscribed loosening of the statutory requirements.

Second, the Secretary's own interpretation of its authority to grant HCBS waivers further confirms that it is permitted to waive only the three otherwise-applicable requirements of the Medicaid Act enumerated in 42 U.S.C. § 1396n(c). The Secretary's regulation implementing the HCBS program specifies that "the following requirements may be waived" under 42 U.S.C. § 1396n(c): the statewideness rule, the comparability rule, and certain specified income and resource rules. 42 C.F.R. § 430.25(d)(2). The regulation does not indicate the availability under the HCBS waiver program of broader permission to avoid the Medicaid Act's requirements. We defer to an agency's reasonable interpretation of an ambiguous statute it is charged with administering. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). The Secretary's determination that the statute permits waiver of only three of the Medicaid Act's provisions is certainly reasonable, for the reasons we have explained. Thus, even if we regarded 42 U.S.C. § 1369n(c) as ambiguous — which we do not — as to the

otherwise-mandatory provisions of the Medicaid Act it allows the Secretary to waive, we would still be compelled to defer to the Secretary's conclusion that the list of waivable provisions in 42 U.S.C. § 1369n(c)(3) is exclusive.

Properly understood, then, the HCBS waiver provision permits the Secretary to waive only three items on the "laundry list" of requirements a state must fulfill to receive funds under the Medicaid Act. Section 30(A) is not one of those waivable requirements. To participate in Medicaid, a state thus must comply with that provision with regard to the program allowed by the HCBS waiver, just as it must for its other Medicaid-covered programs.

The district court premised its contrary conclusion, in part, on 42 C.F.R. § 441.303(g), which authorizes a state "at its option . . . [to] provide for an independent assessment of its waiver that evaluates the quality of care provided, access to care, and cost-neutrality" when applying for an HCBS waiver. The district court thought that regulation "for all intents and purposes incorporates the considerations set forth in Section 30(A)," but does so as an option rather than a requirement, and so determined that compliance with Section 30(A) is *not* required of a state seeking an HCBS waiver.

The district court's conclusion, however, does not follow from its premise, for three reasons. First, and most obviously, a regulation could not make optional a requirement the statute mandates. Second, although demonstrating compliance with Section 30(A) is not required for receipt of an HCBS waiver, that observation does not vitiate a state's independent obligation to satisfy Section 30(A) as to the services covered by an HCBS waiver if the waiver is obtained, as part of its overall state plan obligation.

Third, the regulation allows for an "*independent* assessment," 42 C.F.R. § 441.303(g) (emphasis added), but does not negate the need for *some* assessment, whether by the state agency itself or an independent analyst.

In short, 42 C.F.R. § 441.303(g) does not detract from our conclusion that the HCBS waiver provision retains the Section 30(A) requirement for programs permitted by the waiver.

**2.** Given our understanding of the role of Section 30(A) for states with HCBS programs, Arc has a substantial likelihood of demonstrating that the state officials' implementation of California's uniform holiday schedule and half-day billing rule was inconsistent with Section 30(A). By adopting those policies without studying *at all* their likely effects on the efficiency, economy, quality of care, and access to care California offered the developmentally disabled, the state officials probably disregarded Section 30(A)'s express mandate.

Two precedents, read together, control our interpretation of Section 30(A) — *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491 (9th Cir. 1997), and *Managed Pharmacy Care*, 716 F.3d 1235.

*Orthopaedic Hospital* considered the meaning of Section 30(A) before the Secretary had interpreted it. *See* 103 F.3d at 1495–96. Faced with CMS's silence, we held that a state could not comply with Section 30(A) without "responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting," reasoning that a state "cannot know that it is setting rates that are consistent with efficiency,

economy, quality of care and access without considering the costs of providing such services." *Id.* at 1496.

*Managed Pharmacy Care*, in turn, evaluated Section 30(A) in light of CMS's later, formal approval of two SPAs, communicated in letters expressly stating that the SPAs in those instances were consistent with Section 30(A). 716 F.3d at 1243, 1245. In support of those SPAs, the state had submitted to CMS "access studies" that "reviewed data focused primarily on enrollee needs, provider availability, and utilization of services." *Id.* at 1242. It also submitted studies of provider costs for some, but not all, of the services affected by the SPAs, as well as a detailed "monitoring plan" designed "to ensure the SPAs do not negatively affect beneficiary access." *Id.* CMS's approval indicated that, in the agency's opinion, a state's completion of such access studies, a monitoring plan, and some cost studies was sufficient to comply with Section 30(A). *Id.* at 1245. We deferred to that interpretation as a reasonable reading of Section 30(A)'s ambiguous mandate, noting that enforcement of Section 30(A) through approval or disapproval of state plans and their implementation is committed to the Secretary (and delegated, in large part, to CMS). *Id.* at 1250.

*Managed Pharmacy Care* emphasized that Section 30(A) "does not prescribe any particular *methodology* a State must follow before its proposed rates may be approved." *Id.* at 1245 (emphasis added). It did not thereby relieve states from doing *something* to comply with Section 30(A), which expressly requires "methods and procedures" to fulfill its mandate. 42 U.S.C. § 1396a(a)(30)(A). Instead, *Managed Pharmacy Care* approved the affirmative measures enumerated by the state in that case as sufficient to meet the Section 30(A) requirements.

Here, the state officials do not dispute that California did *nothing whatever* to study the likely effects of its uniform holiday schedule or half-day billing rule on the "efficiency, economy, and quality of care" or the availability of service providers, before enacting and implementing those rules. The reasonable interpretation to which we deferred in *Managed Pharmacy Care* does not condone such complete abdication.

The district court nonetheless relied on *Managed Pharmacy Care*, reasoning that CMS's approval of California's HCBS waiver renewal application indicates that CMS believed California's payment reductions consistent with Section 30(A). Unlike in *Managed Pharmacy Care*, however, CMS's approval of California's waiver renewal application did not expressly conclude that the state's new policies comply with Section 30(A). Nor will we infer such a conclusion, for two independently sufficient reasons.

First, California's HCBS waiver renewal application did not disclose its recently implemented uniform holiday schedule or its new half-day billing rule. In approving that application, CMS could have reviewed, even inferentially, only matters presented in it. Because California's HCBS waiver renewal application discussed neither the uniform holiday schedule nor the half-day billing rule, we have no reason to believe that CMS was aware of those policies, let alone that it impliedly approved them.[6]

---

[6] The state officials informed CMS of the state's now-expired percentage rate reductions, both in a meeting and, subsequently, in a written response to CMS's written inquiry. They have not demonstrated, however, that they ever informed CMS of the uniform holiday schedule or the half-day billing rule.

The district court emphasized that California's waiver renewal application included over 200 pages worth of material, some of which included data on the cost of the programs operated under the waiver and the rates at which those programs' services were utilized. The Secretary requires such information as part of the waiver approval process, *see* 42 C.F.R. §§ 441.302(h), 441.303(f), so that CMS can evaluate a state's compliance with the statutory requirements for an HCBS waiver. The statute requires, for example, per capita expenditures equal to what they would have been without a waiver and annual reporting on the type and amount of services provided. *See* 42 U.S.C. § 1396n(c)(2)(D)–(E). That information is not directly relevant to the considerations enumerated in Section 30(A), which, among other things, requires comparing service recipients' access to care to that of the general population.

Second, the state's failure to provide information on the uniform holiday schedule and half-day billing rule reflects the scope and purpose of the HCBS waiver application process. As discussed, *see supra* Part III.A.1, approval of an HCBS waiver does not affect the requirement that the state plan, overall, comply with all provisions of the Medicaid Act, including Section 30(A), that the Secretary has not waived. Pursuant to 42 C.F.R. § 430.25(g)(1), CMS "approves waiver requests [under 42 U.S.C. § 1396n(b)–(c)] if the State's proposed program or activity meets the requirements of the Act and the regulations at § 431.55 or subpart G of part 441 of this chapter[, 42 C.F.R. §§ 441.300–441.310]." Section 430.25 deals only with the waivers incorporated into state plans, not the state plans themselves. The approval of state plans is the subject of separate regulatory provisions. *See, e.g.*, 42 C.F.R. §§ 430.10–430.18. In particular, 42 C.F.R. § 430.25(g)(1) lists § 431.55 and 42 C.F.R.

§§ 441.300–441.310 as the relevant regulations considered for purposes of waiver approval; both of those regulations interpret only the statutory requirements for a *waiver* under 42 U.S.C. § 1396n(b)–(c), respectively.  Thus, 42 C.F.R. § 430.25(g)(1) requires consideration for purposes of waiver approval of the *waiver* requirements of the Act and the implementing regulations, not of the separate, more generally applicable state plan requirements.[7]

In relying on *Managed Pharmacy Care*, then, the district court applied the wrong legal standard to the case before it. *Managed Pharmacy Care* neither condones the sort of complete inaction California has demonstrated here nor compels our deference to CMS's approval of the HCBS waiver application.[8]  We conclude that California's total

---

[7] We note that the mention of "the Act" in 42 C.F.R. § 430.25(g)(1) necessarily refers to the Act's waiver provisions.  Section 430.25 in its entirety implements the waiver provisions of the Act only.  In accord with that limitation, the regulations listed right after "the Act" in subsection (g)(1) deal only with waivers, not with state plans generally, although the regulations governing state plans generally are extensive.  Application of the interpretive maxim that "a word is known by the company it keeps," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), counsels the understanding that 42 C.F.R. § 430.25(g)(1), like the larger section of which it is a part, is limited to assuring compliance with the statutory and regulatory waiver requirements, and that its reference to "the Act" is to the Act's waiver provisions.

[8] The district court asserted that Arc's ADA and Rehabilitation Act claims were premised on California's alleged non-compliance with Section 30(A).  The district court therefore concluded that the ADA and Rehabilitation Act claims fell alongside the Section 30(A) claim, all being equally unlikely to succeed on the merits.  Because we hold the district court's conclusion as to the Section 30(A) claim an abuse of discretion, its evaluation of the ADA and Rehabilitation Act claims — which relied on that conclusion — was equally erroneous.

abdication of its obligations under Section 30(A) indicates that Arc is likely to prevail on the merits of its challenges under the Medicaid Act to the uniform holiday schedule and half-day billing rule. The district court abused its discretion in determining otherwise, and so in assessing Arc's likelihood of success on the merits.

### B.

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is possible. *Winter*, 555 U.S. at 22. The district court determined that no such injury was likely here. After reviewing the record carefully, we conclude that each of the factual bases on which the district court premised its decision was either clearly erroneous or legally irrelevant.

**1.** The district court first invoked *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, which held that a plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." 762 F.2d 1374, 1377 (9th Cir. 1985). Because "the payment reductions at issue were in place more than two years before suit was filed on behalf of Plaintiffs in 2011," the district court reasoned, Arc's delay "weighs against irreparable harm."

---

The district court also appears to have misconstrued the scope of Arc's ADA and Rehabilitation Act claims. Arc premised those claims not just on California's alleged non-compliance with Section 30(A), but also on the allegation that California's policies increased the risk of institutionalization to the disabled, and thus constituted discrimination. *See M.R.*, 697 F.3d at 734–35. On remand, the district court should consider that argument to the extent, if any, pertinent to determining the propriety of preliminary relief.

The record, however, does not support the finding that two years passed between the enactment of the relevant statutes and the filing of this lawsuit. True, the California legislature enacted the *first* percentage payment reduction measure, which decreased payments by three percent, over two years before Arc brought suit. But Arc also challenges the extension and expansion of that measure in two subsequent statutes passed one year and three months, respectively, before this lawsuit was filed. In any case, the expiration of that percentage payment reduction measure during the pendency of this appeal renders it moot. *See supra* Part II.

Significantly for present purposes, one of the two provisions as to which Arc's challenge is not moot, the half-day billing rule, was passed only months before the initiation of this lawsuit. Although the uniform holiday schedule had been in effect for nearly two years, the injury Arc alleges here is inherently cumulative, turning on the aggregate effect over time of the several payment reductions. It is the implementation of *all* the challenged statutes, not the first, that is relevant for irreparable harm purposes. The district court's finding that the constellation of payment reductions challenged here was in effect for over two years is thus contradicted by the record, making it clearly erroneous.

For the district court's benefit on remand, we add that it is unlikely that Arc's putative delay is especially probative here. Usually, delay is but a single factor to consider in evaluating irreparable injury; courts are "loath to withhold relief solely on that ground." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984). Although a plaintiff's failure to seek judicial protection can imply "'the lack of need for speedy action,'" *id.* at 1213 (quoting *Gillette*

*Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)), such tardiness is not particularly probative in the context of ongoing, worsening injuries. Here, for example, the alleged injuries resulted from various cuts in compensation, enacted over a period of time and having a cumulative impact. In such circumstances, the magnitude of the potential harm becomes apparent gradually, undermining any inference that the plaintiff was "'sleeping on its rights.'" *Id.* (quoting *Gillette Co.*, 178 F. Supp. at 622). In particular, we note that the harm alleged here related in part to the continued economic viability of service providers in the face of cuts in compensation. So the actual impact of the various reductions in compensation might well become irreparable only over time. Under such circumstances, waiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory. The significance of such a prudent delay in determining irreparable harm may become so small as to disappear.

**2.** The district court next emphasized Arc's inability to demonstrate that any regional center had sought a statutory exemption from the percentage payment reduction as "necessary to protect the health and safety of" service recipients. Because Arc's motion to enjoin that percentage payment reduction has been mooted by its expiration, *see supra* Part II, the district court's observation is no longer directly relevant. As the district court itself recognized, the statutes enacting the uniform holiday schedule and half-day billing rule authorize no parallel exemptions.

Moreover, we doubt there is a logical connection between the *regional centers*' ability to seek exemptions and irreparable harm done to *service providers*. The record suggests that at least one regional center refused to submit an

exemption request on behalf of a beleaguered service provider.

In sum, as applied to the two surviving statutes, there is no significance to the absence of applications for statutory exemptions from the now-expired statute.

**3.** Last, the district court emphasized the paucity of evidence indicating that developmentally disabled persons have already suffered from the payment reductions. Whether that is so is not legally relevant. That the service *providers* have managed to continue to provide care notwithstanding the reductions does not detract from the harm the providers face with regard to their continued viability.

Arc has brought this suit on behalf of — and moved for preliminary injunctive relief to prevent irreparable harm to — their members, including *both* the providers and the recipients of services. Whether service recipients have already suffered from reductions of services does not bear on whether these payment reductions currently threaten the continued viability of those who serve them, and so irreparably, if not immediately, threaten the future availability of services for the service recipients. So, to the extent the district court extrapolated from the lack of evidence of *past* harm to service recipients a lack of evidence of harm to the ability of service providers to *continue* to provide care, the extrapolation was illogical and thus an abuse of discretion.

We conclude that clearly erroneous factfinding marred the district court's evaluation of the irreparable harms facing Arc.

## C.

When ruling on a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). And it must "weigh in its analysis the public interest implicated by [an] injunction." *Stomans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). When balancing the equities and the public interest here, the district court relied on its evaluation of the merits and the harms facing Arc's members. As noted, its evaluation of both constituted an abuse of discretion. *See supra* Part III.A–B. Those errors thus infect the district court's balancing of the equities and its weighing of the public interest, into which they were incorporated.

## D.

In conclusion, we hold that Arc has a substantial likelihood of success on the merits of its Medicaid Act claims, and we hold that the district court abused its discretion in certain respects in evaluating the harm suffered by Arc's members. We do not, however, direct the issuance of a preliminary injunction.

The current record is insufficient to permit our independent evaluation of the harms threatening Arc's members, the balance of the equities, or the public interest implicated by an injunction. That record was assembled before the expiration of the percentage payment reductions. Although the evidence it contains describes some of the consequences of the uniform holiday schedule and half-day billing rule, it much more often refers to the *aggregate* effect

of those policies and the now-expired percentage payment reductions. Given that those reductions became moot on appeal, the record must be developed anew to permit proper evaluation of the motion for preliminary injunctive relief.

Where the propriety of an injunction "raise[s] intensely factual issues," the matter "should be decided in the first instance by the district court." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995) (internal quotation marks omitted). The threat of irreparable harm to Arc, the balancing of the equities, and the public interest implicated by an injunction present precisely such intensely factual questions. "Because the grant of a preliminary injunction is a matter committed to the discretion of the trial judge, we remand this case to the district court for consideration of the remaining *Winter* factors in the first instance." *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1307 (9th Cir. 2013) (internal quotation marks, citation, and brackets omitted); *accord Diouf v. Mukasey*, 542 F.3d 1222, 1235 (9th Cir. 2008).

## IV.

In addition to its preliminary injunction appeal, Arc challenges the order dismissing its Medicaid Act claims under Federal Rule of Civil Procedure 12(b)(6).

Standing on its own, the district court order dismissing the Medicaid Act claims would lie beyond our jurisdiction. It was not a final decision under 28 U.S.C. § 1291. The district court did not dismiss Arc's claims under the ADA, Rehabilitation Act, and Lanterman Act and thus "did not dispose of the action as to *all* claims between the parties." *Prellwitz v. Sisto*, 657 F.3d 1035, 1038 (9th Cir. 2011). Nor

does that order fall within any of the categories of interlocutory orders the appeal of which we may consider under 28 U.S.C. § 1292. And it is not included in that "'narrow class of [district court] decisions that do not terminate the litigation, but are sufficiently important and collateral to the merits that they should nonetheless be treated as final'" under the collateral order doctrine. *Nunag-Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 711 F.3d 1136, 1138 (9th Cir. 2013) (quoting *Will v. Hallock*, 546 U.S. 345, 347 (2006)).

The dismissal order, however, does not appear before us on its own. It arises in connection with the district court's denial of Arc's motion for preliminary injunctive relief, an interlocutory order over which we do have jurisdiction. *See* 28 U.S.C. § 1292(a)(1). Under such circumstances, "we *may* also exercise pendent appellate jurisdiction over any 'otherwise non-appealable ruling [that] is inextricably intertwined with or necessary to ensure meaningful review of the order properly before us on interlocutory appeal.'" *Melendres v. Arpaio*, 695 F.3d 990, 996 (9th Cir. 2012) (some internal quotation marks omitted) (quoting *Meredith v. Oregon*, 321 F.3d 807, 813 (9th Cir. 2003), *as amended*, 326 F.3d 1030 (9th Cir. 2003)). We "exercise restraint" in invoking our pendent appellate jurisdiction, *Meredith*, 321 F.3d at 812, "setting a 'very high bar' for [its] exercise," *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 (9th Cir. 2007) (quoting *Poulos v. Ceasars World, Inc.*, 379 F.3d 654, 669 (9th Cir. 2004)). This case clears that bar, because the district court's order denying preliminary injunctive relief is "inextricably intertwined" with its order dismissing Arc's Medicaid Act claims.

"'[D]istrict court rulings are inextricably intertwined with a preliminary injunction when the legal theories on which the issues advance [are] . . . so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or . . . resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue.'" *Melendres*, 695 F.3d at 996 (second alteration in original) (some internal quotation marks omitted) (quoting *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1134 (9th Cir. 2005)). For this latter reason, a pendent order that concerns the same legal issue and relies on the selfsame reasoning as the order over which this Court exercises primary appellate jurisdiction usually qualifies as "inextricably intertwined."**[9]**

Conversely, two issues are not inextricably intertwined where their resolution requires "application of separate and distinct legal standards." *Meredith*, 321 F.3d at 815. Standards are "separate and distinct" where they "'turn on wholly different factors.'" *Burlington N. & Santa Fe Ry.*, 509 F.3d at 1093 (quoting *Poulos*, 379 F.3d at 670). Where two legal standards overlap in part, we may exercise pendent jurisdiction where we resolve the primary appeal on the basis of that overlapping component of the analysis, in a manner

---

**[9]** *Streit v. County of Los Angeles*, for example, exercised pendent jurisdiction over orders that "raise[d] the same issues, use[d] the same legal reasoning, and reach[ed] the same conclusions as the earlier orders over which" we had original jurisdiction. 236 F.3d 552, 559 (9th Cir. 2001). Similarly, *Wong v. United States* exercised pendent jurisdiction over the district court's denial of a motion to dismiss for failure to state a claim because that issue, like the qualified-immunity appeal over which we had primary jurisdiction, turned on "whether the facts as alleged state a claim for violation of constitutional or statutory rights." 373 F.3d 952, 961–62 (9th Cir. 2004).

that resolves "'all of the remaining issues presented by the pendent appeal.'" *Huskey v. City of San Jose*, 204 F.3d 893, 905 (9th Cir. 2000) (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995)); *see also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 n.3 (9th Cir. 2011) (declining to exercise pendent appellate jurisdiction where we resolved the primary appeal on a ground that did not overlap with the pendent appeal); *Wong*, 373 F.3d at 962 (same).

Although the standards for a motion for preliminary injunctive relief and dismissal under Rule 12(b)(6) are not conterminous, they overlap where a court determines that the plaintiff has no chance of success on the merits. "'The irreducible minimum [for a preliminary injunction] . . . is that the moving party demonstrate a fair chance of success on the merits or questions serious enough to require litigation. No chance of success at all will not suffice.'" *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006) (quoting *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982)). So, too, for a motion to dismiss: If there is "no chance of success" on the merits, *E. & J. Gallo*, 446 F.3d at 990, then the complaint does not "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and must be dismissed.

Here, the district court refused to grant a preliminary injunction on Arc's Medicaid Act claims for the selfsame reason it dismissed those claims. Both orders, which issued the same day, reasoned that CMS's approval of California's HCBS waiver application demonstrated the state's compliance with the Medicaid Act, such that Arc had no

chance of succeeding on the merits. Indeed, several pages of both orders employed *identical* language.[10]

We have held that the district court abused its discretion in determining that Arc had no chance of success on the merits. *See supra* Part III.A. To reach that holding, we necessarily reviewed the same legal considerations as underlay dismissal of those claims. We therefore reverse the dismissal of Arc's Medicaid Act claims related to the uniform holiday schedule and half-day billing rule.

## V.

In conclusion, we DISMISS as moot Arc's challenges to the percentage payment reductions, REVERSE the district court's denial of preliminary injunctive relief as an abuse of discretion, REMAND the matter for its reconsideration in the first instance, and REVERSE the dismissal of Arc's Medicaid Act challenges to the uniform holiday schedule and half-day billing rule.

**DISMISSED IN PART, REVERSED IN PART, and REMANDED.**

Each party shall bear its own costs on appeal.

---

[10] A Second Circuit case may offer the closest analogy to the circumstances presented here. *Lamar Advertising of Penn, LLC v. Town of Orchard Park, New York* exercised pendent jurisdiction over an order denying summary judgment "[b]ecause the district court . . . denied [the plaintiff's] request for a preliminary injunction for the very same reasons it denied [the plaintiff's] motion for summary judgment," such that the two orders were inextricably intertwined. 356 F.3d 365, 372 (2d Cir. 2004).